Richard ROE, etc., Plaintiff,

v.

L. T. CONN, etc., et al., Defendants.

Margaret Ann WAMBLES, etc., Plaintiff,

v.

L. T. CONN, etc., et al., Defendants.

Richard ROE, etc., et al., Plaintiffs,

v.

Cecil COPPAGE et al., Defendants.

Civ. A. Nos. 75–232–N, 75–233–N and 75–457–N.

United States District Court, M. D. Alabama, N. D.

July 6, 1976.

Pamela S. Horowitz, Joseph J. Levin, Jr., John L. Carroll and Morris S. Dees, Jr., Montgomery, Ala., for plaintiffs in all three cases.

Nicholas T. Braswell, III (Rushton, Stakely, Johnston & Garrett), Montgomery, Ala., for the defendant Montgomery Police officials—L. T. Conn, a patrolman with the City of Montgomery Police Department, and E. L. Wright, Jr., the Chief of Police, and Charles Swindall, who succeeded him as Chief of Police during the pendency of these suits.

Jack A. Blumenfeld, Asst. Atty. Gen., State of Alabama, Montgomery, Ala., for Barbara Ward, the Director of the Montgomery County Youth Facility, and Judge William F. Thetford, Judge of the Montgomery County Family Court, and Judge John W. Davis, who succeeded Judge Thetford during the course of these lawsuits and Probate Judge Walker Hobbie, Jr.

Jamie L. Pettigrew, Mary Lee Stapp and J. Michael Crouch, Asst. Attys. Gen., State of Alabama, Dept. of Pensions and Security, Montgomery, Ala., for Julia Oliver, the Commissioner of the Alabama Dept. of Pensions and Security, and Ada Kate Morgan, the Director of the Montgomery County Dept. of Pensions and Security.

L. Wayne Collier and L. H. Walden, Montgomery, Ala., for the defendant Cecil Lawrence Coppage.

J. Michael Crouch, Montgomery, Ala., for defendant Probate Judge Walker Hobbie, Jr.

Before RIVES, Circuit Judge, JOHNSON, Chief District Judge, and VARNER, District Judge.

## OPINION

These cases were consolidated for trial because of a common background of facts. *Wambles v. Conn*, Civil Action No. 75–233–N, is a class action challenging the constitutionality of Alabama's child neglect law, Alabama Code, Title 13, § 350 *et seq.* (1958). Plaintiff Margaret Wambles represents a class composed of mothers who have been or may be deprived of the custody of their

child or children without a prior hearing where there was no showing of immediate or threatened harm, and a subclass composed of all mothers who have been or may be deprived of their child or children because they are living with men (other than relatives or boarders) to whom they are not married. *Roe v. Conn*, Civil Action No. 75–232–N, challenges the constitutionality of the same child neglect law from the vantage point of the child's protectable interest. Plaintiff Richard Roe represents a class composed of all children under the age of 16 who have been or may be removed from their mothers without a prior hearing, absent a showing of immediate harm or threatened harm, and all children not appointed counsel to represent their interests, and a subclass composed of all children who have been or may be removed from their mother because their mothers are living with men (other than relatives or boarders) to whom they are not married. *Roe v. Coppage*, Civil Action No. 75–457–N, is an action brought by Richard Roe and Plaintiff Wambles which seeks to challenge the constitutionality of the state law, Alabama Code, Title 27, §§ 11–12 (1973 Supp.), that allows a man in an *ex parte* proceeding to legitimatize an illegitimate child by declaring himself the father and in the same proceeding to change the child's name.

Defendants in these cases are Cecil Coppage; Hon. Walker Hobbie, individually and in his official capacity as Judge of Probate of Montgomery County, Alabama; L. T. Conn, individually and in his official capacity as a patrolman with the City of Montgomery Police Department; E. L. Wright, Jr., individually and as Chief of Police of the City of Montgomery Police Department; Barbara Ward, individually and as Director of the Montgomery County Youth Facility; Julia Oliver, individually

and as Commissioner of the Alabama Department of Pensions and Security (DPS); Ada Kate Morgan, individually and as Director of the Montgomery County Department of Pensions and Security; and Hon. William F. Thetford, individually and as Judge of the Montgomery County Family Court. During the course of the lawsuit, Hon. John W. Davis succeeded Judge Thetford as Judge of the Montgomery County Family Court and Mr. Charles Swindall replaced Mr. Wright as Chief of the Montgomery Police Department. The successors were automatically substituted as defendants pursuant to F.R.C.P. 25(d).

A three-judge court has been convened pursuant to 28 U.S.C. § 2281 to decide these constitutional questions. After a pretrial conference at which many of the facts were stipulated, the case was submitted for decision upon the briefs and documents supplied by the parties.

## FINDINGS OF FACT

Margaret Wambles is a 25-year-old white woman who has never married. On September 15, 1971, Plaintiff Wambles gave birth to a son, Richard Roe, who lived with her continuously until June 2, 1975, when he was seized by Officer L. T. Conn of the Montgomery Police Department and placed in the custody of the Montgomery County Department of Pensions and Security. This seizure was ordered by Judge Thetford of the Montgomery County Family Court without affording Plaintiff Wambles prior notice and a hearing. Such authority as exists for this action is provided by Alabama Code, Title 13, §§ 350(2) and 352(4), which purports to permit a juvenile court judge to summarily remove a "neglected child" from its home if the judge believes the child's welfare so warrants.[1]

---

1. Title 13, § 350(2) reads in pertinent part: "The words 'neglected child' shall mean any child, who, while under sixteen years of age * * * has no proper parental care or guardianship or whose home, by reason of neglect, cruelty, or depravity, on the part of his parent or parents, guardian or other person in whose care he may be, is an unfit and improper place for such child * * * or is under such im-

proper or insufficient guardianship or control as to endanger the morals, health or general welfare of such child * * * or who for any other cause is in need of the care and protection of the state." Sec. 350(4) provides that any child described as neglected shall be subject to the guardianship of the state and entitled to its care and protection. Sec. 352 sets forth the procedure to be followed in a child

The investigation which led to termination of Plaintiff Wambles parental rights was prompted by Defendant Coppage. Mr. Coppage, who is white, lived intermittently with Plaintiff Wambles from 1970 until March, 1975, and claims to have fathered Richard Roe. On June 1, 1975, Mr. Coppage contacted the Montgomery Police Department and reported that Plaintiff Wambles might be neglecting Richard Roe, that she had been evicted from her former residence because she was keeping company with black males, and that she had moved to Highland Village (a black neighborhood) where she was living with a black man. On the basis of this information, Police Officer Conn initiated an investigation of Plaintiff Wambles. The records of the Montgomery Police Department were checked but revealed no previous complaints of child neglect against Plaintiff Wambles and no adult file on her. Meanwhile, on June 2, 1975, Defendant Coppage went to the office of Barbara Ward, Director of the Montgomery County Youth Facility, and told her that he was the father of Richard Roe; that he had once lived with Margaret Wambles, who was now living with a black man and entertaining other black men; that he had reported this to the Montgomery Police Department; that he wanted to get the child out of the house; and that he wanted custody of the child.[2] Following Defendant Coppage's visit to her office, Defendant Ward conferred with Judge Thetford and then called the Montgomery Police Department. According to the police report prepared by

Officer Conn, Defendant Ward advised the police to request a pick-up order if Margaret Wambles and Richard Roe were living with a man to whom Margaret Wambles was not married. Officer Conn went to the Wambles' residence, 1033–E Highland Village Drive, Montgomery, Alabama, at approximately 7:30 P.M. on June 2, 1975. Plaintiff Wambles permitted Officer Conn to enter and inspect her dwelling, which the officer found was a two-bedroom apartment, where Plaintiff Wambles and her son were living with a black man to whom she was not married. Richard Roe was clothed, clean, and in "fairly good" physical condition with no signs of physical abuse. The home was "relatively clean" and stocked with "adequate food." Upon completing his inspection, Defendant Conn left the home and called Defendant Ward and reported his findings. He was then instructed by Defendant Ward to go to the Youth Facility and get a pick-up order. The only facts about Margaret Wambles known to Judge Thetford before he issued the pick-up order were that she was unemployed and that she and her child are white and were living with a black man in a black neighborhood. Judge Thetford had no information as to how long Margaret Wambles had lived in Montgomery, where she had worked, or how long she had been unemployed.[3] He had no evidence that Richard Roe was being physically abused and no information as to the condition of the Wambles' home. Judge Thetford knew nothing about the man with whom Margaret Wambles was

neglect case. A verified complaint is first filed with the juvenile court of the county of the child's residence by any person having knowledge of, or information concerning, the child. It is sufficient for the petition, after briefly stating the relevant facts, to aver that the named child is neglected and in need of the care and protection of the state. Upon the filing of the petition, the judge, clerk, or chief probation officer of the court shall cause an examination to be made and shall issue a summons requiring the child to appear before the court. Sec. 352(4) provides that, "If it appears from the petition that * * * the child is in such condition that its welfare requires that custody be immediately assumed, the judge of the court may endorse upon the summons a direction that the officer serving said summons

shall at once take said child into his custody." The statute further provides that the custody of any child who has been summarily seized is subject to the discretion of the judge pending hearing of the case.

2. In Montgomery County, both the Youth Aid Division of the Police Department and the County Department of Pensions and Security may investigate cases of possible child neglect or dependency and request an immediate pick-up order or file a removal petition.

3. Plaintiff Wambles had lived in Montgomery, Alabama, since 1969 and had worked at Morrison's Cafeteria from 1969 to 1972 and again from August 1974 until May 1975.

living, other than his race and the fact that he was not married to her. Judge Thetford testified that the race of the man with whom Plaintiff Wambles was living was relevant to his decision to order Richard Roe removed from his mother's custody, particularly because they were living in a black neighborhood. Judge Thetford concluded that this habitation in a black neighborhood could be dangerous for a child because it was his belief that "it was not a healthy thing for a white child to be the only [white] child in a black neighborhood."

At approximately 8:30 P.M. on June 2, 1975, after obtaining the pick-up order, Defendant Conn, accompanied by two other Montgomery police officers, returned to Plaintiff Wambles' home. When Defendant Conn announced that he had come to take Richard Roe, Plaintiff Wambles picked up her child and ran to the back of the apartment. After Defendant Conn showed Plaintiff Wambles the pick-up order, she still refused to surrender the child. Thereupon, with the child crying, "No, mama, don't let him take me," Defendant Conn grabbed Plaintiff Wambles by the arm and pulled her back into the living room, took Richard Roe from her arms, and left without leaving a copy of the pick-up order. After the seizure, Defendant Conn took Richard Roe to a DPS-licensed shelter home in Montgomery.

No hearing was scheduled or held following Richard Roe's removal until July 10, 1975. No attorney was requested or appointed to represent Richard Roe at the July 10 hearing. At the hearing in the Family Court of Montgomery County, both Defendant Coppage and Plaintiff Wambles were present and represented by counsel. Judge Thetford entered an order on July 11, 1975, wherein he awarded Defendant Coppage custody of Richard Roe after making a finding that he was the natural father of the child. The temporary custody order gave Margaret Wambles "the right to petition the court for custody of [Richard Roe] at any future date." Plaintiff Wambles'

first petition for custody, filed on August 5, 1975, along with her motion for a new trial and motion for order for blood tests, was denied on August 14, 1975, by Judge Thetford as untimely filed.[4] A second petition for custody was filed by Plaintiff Wambles in November and denied by Judge John W. Davis, III, on December 22, 1975. The denial of this last petition was affirmed by the Alabama Court of Civil Appeals. *Wambles v. Coppage*, Civil No. 746, filed June 16, 1976.

On December 11, 1975, Plaintiff Wambles learned for the first time that Defendant Coppage had executed a declaration of fatherhood with respect to Richard Roe and had his last name changed from Wambles to Coppage. Since Margaret Wambles was unmarried at the time of Richard Roe's birth, under Title 22, § 33, he was given his mother's surname, and no information as to his father appeared on his birth certificate. The declaration of fatherhood and the name change were effected on August 22, 1975, when Cecil Coppage executed a document before Defendant Hobbie, Judge of the Probate Court of Montgomery County, pursuant to Alabama Code, Title 27, §§ 11–12 (Supp.1973). The address which appeared on Defendant Coppage's declaration of fatherhood is the Montgomery address of his attorney, although Defendant Coppage is a resident of Troy, Alabama, which is in Pike County. Neither Margaret Wambles nor Richard Roe was given notice or an opportunity to be heard relative to the August 22, 1975, declaration of fatherhood and name change.

On October 9, 1975, the Alabama Legislature passed Alabama Act No. 1205 to implement the new judicial article of the State Constitution. Article V of this Act purported to immediately repeal §§ 350, *et seq.* of Alabama Code, Title 13, replacing them with new statutory provisions. Defendants Oliver and Morgan moved to dismiss for mootness, citing the legislative repeal of the challenged statute. The Alabama Supreme Court, in reviewing Act No.

---

4. The motion for a new trial had requested that blood tests be taken of the parties involved and a new determination be made of Richard Roe's parentage in light of the results of those tests.

1205, however, concluded that Article V shall become effective on January 16, 1977, and that statutory provisions currently effective will remain in full force and effect until that time. See Appendix A. The controversy is, therefore, still a live one and cannot be dismissed for mootness.

### EXPERT TESTIMONY

Plaintiffs Wambles and Roe have submitted the testimony of witnesses Dr. Sally A. Provence[5] and Dr. Albert J. Solnit[6] as experts in the field of child care and development. Drs. Provence and Solnit summarized their views as follows:

1. Summary removal of a young child from a parent who has been his major caregiver is a severe threat to his development. It disrupts and grossly endangers what he most needs, that is, the continuity of affectionate care from those to whom he is attached through bonds of love.

2. Summary removal should be allowed only under conditions in which physical survival is at stake.

3. In situations in which some interference is indicated because parents are unable to take good care of their child, there are alternatives to summary removal which should be used either singly or in combination. Among these are the following: (a) the provision in the child's home of assistance to parents with child care and with managing a household; (b) the provision of counselling to parents about how to care for a child in ways that enhance his development and well-being; (c) the provision of a day care center or day care family in which assistance to child and parent can be provided which is addressed to their specific needs; (d) the provision of a residential facility or foster family in which both parent and child can receive the nurture and guidance they may need (in extended families, relatives often supply such benevolent help, and when they are unavailable, it is one of society's responsibilities to organize and make available such assistance); and (e) the provision of 24-hour substitute care for a child, which does not cut him off from contact with his parents.

Another witness, Dr. Jonas Robitscher,[7] gave similar testimony in his deposition:

All authorities agree that there are circumstances under which summary removal of the child from his or her parent should be allowed. These circumstances would include and would be very much limited to situations in which the child was being physically abused as in the battered-child syndrome, where the child was being sexually abused as in the examples we see of stepfathers or sometimes real fathers having incestuous relationships with children, when children are brought up in an atmosphere incompatible with physical health because of neglect, lack of food and extreme uncleanliness, and when there is so little care taken of the child that the child is in danger as when small children are allowed to roam unsupervised in dangerous streets. However, most authorities agree that even psychotic or disturbed mothers can often do a good mothering job and psychotic and disturbed mothers are preferable, providing the circumstances described immediately above are not present, to institutional or impersonal

---

5. Dr. Sally A. Provence is professor of pediatrics at Yale University Child Study Center and Director of the Child Development Unit, author of Guide to the Care of Infants in Groups (1967), and co-author of Infants in Institutions. For the past 25 years, she has been involved in clinical work with children and parents in child development research.

6. Dr. Albert J. Solnit is Sterling Professor of Pediatrics and Psychiatry and Director of the Child Study Center at Yale University. In this capacity, he teaches child development, child psychiatry, family law, and child psychoanalysis. Dr. Solnit has published, in corroboration with Dr. Milton J. E. Senn, a textbook, Problems in Child Behavior and Development (1968), and, in corroboration with Drs. Goldstein and Freud, a book entitled, Beyond the Best Interests of the Child (1973).

7. Dr. Jonas Robitscher is a Henry R. Luce, Professor of Law and the Behavioral Science at Emory University Schools of Law and Medicine.

care. The thrust of studies in child development then indicates that children should be summarily removed from their mothers only when their physical health and emotional health are at serious risk and only after all other alternatives to removal have been thoroughly studied.

## CONCLUSIONS OF LAW

*The Fundamental Right to Family Integrity:* A district court in Iowa recently reviewed the long line of Supreme Court cases addressed to the constitutional interests at stake where various aspects of family life are threatened and concluded that there is a fundamental right to family integrity protected by the Fourteenth Amendment to the United States Constitution. *Alsager v. District Court of Polk County, Iowa,* 406 F.Supp. 10, 15 (S.D.Iowa 1975). The seminal case in this constitutional development is *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), where the Supreme Court held that the "liberty" guarantee of the Fourteenth Amendment "without doubt * * * denotes * * * the right of the individual * * * to marry, establish a home and bring up children." *Id.* at 399, 43 S.Ct. at 626. The result of this decision was to uphold the right of the parents to have their children taught the German language. In *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Court again recognized this liberty of parents to direct the rearing and education of children, and in *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), it said:

It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder * * * and it is in recognition of this that these decisions (*Meyer* and *Pierce*) have respected the private realm of family life which the state cannot enter. 321 U.S. at 166, 64 S.Ct. at 442.

A more recent Supreme Court decision, *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), reaffirms the constitutional nature of this interest: "freedom of personal choice in mothers of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Id.* In addition to the "liberty" concept of the Fourteenth Amendment, the Supreme Court has been equally solicitous of the family enclave under the doctrine of privacy. See *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Finally in *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Supreme Court declared unconstitutional the Illinois dependency statute that deprived an unmarried father of the care and custody of his natural children upon the death of their mother. In doing so, the Court held that the right to the integrity of the family unit was protected by the Fourteenth Amendment due process and equal protection clauses and by the Ninth Amendment. *Id.* at 651, 92 S.Ct. 1208.

■ This Court is in full agreement with the conclusion of Chief Judge Hanson in *Alsager, supra,* that the Constitution recognizes as fundamental the right of family integrity. This means that in our present case the state's severance of Plaintiff Wambles' parent-child relationship and of Plaintiff Roe's child-parent relationship will receive strict judicial scrutiny. See *Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Recognizing that fundamental right, this Court will now apply the pertinent constitutional principles to the facts of the present case.

■ *Summary Seizure:* This Court holds that Alabama Code, Title 13, § 352(4), which authorizes summary seizure of a child "if it appears that * * * the child is in such condition that its welfare requires," violates procedural due process under the Fourteenth Amendment of the United States Constitution.

■ To determine the nature of the procedural safeguards that the Constitution mandates, the administrative needs of the State must be carefully balanced against the interests of the affected citizens.[8] There is no question that the family members will suffer a grievous loss if the State severs the parent-child relationship;[9] an interest, we have held, that is part of the liberty concept of the Fourteenth Amendment. The State of Alabama, on the other hand, does have a legitimate interest in protecting children from harm as quickly as possible. Normally, before intrusion into the affairs of the family is allowed, the State should have reliable evidence that a child is in need of protective care. In the absence of exigent circumstances, this fact-finding process, as a matter of basic fairness, should provide notice to the parents and child of the evidence of abuse and provide them with an opportunity for rebuttal at a hearing before an impartial tribunal.[10]

■ The facts of this case dispel any notion that the State was faced with an emergency situation. As we earlier found, Officer Conn's investigation revealed that Richard Roe was clothed, clean, and in "fairly good" physical condition with no signs of physical abuse. The Wambles' home was "relatively clean" and stocked with "adequate food." Without danger of immediate harm or threatened harm to the child, the State's interest in protecting the child is not sufficient to justify a removal of the child prior to notice and a hearing. Additionally, even in the event summary seizure had been justified, a hearing would have had to follow the seizure "as soon as practicable" and not six weeks later as it did in the present case. See *Goss v. Lopez, supra; Laing v. United States,* 161 U.S. 423, 96 S.Ct. 473, 46 L.Ed.2d 416 (decided January 13, 1976) [Brennan, *concurring*]. For these reasons, this Court is of the opinion that Alabama Code Title 13, § 352(4) violates the procedural due process clause of the Fourteenth Amendment. We also hold that the statute's "welfare" standard is unconstitutionally vague and an unconstitutional infringement on the fundamental right to family integrity for reasons similar to those discussed, *infra,* concerning removal of the child after a hearing on the basis of a "neglect" finding.

*Removal Upon a Finding of "Neglect":* After the hearing on July 10, 1975, Judge Thetford ordered the termination of the parental rights of Plaintiff Wambles to Richard Roe on the basis that the child was "a dependent or neglected child as defined by the laws of Alabama." As mentioned earlier, Alabama Code, Title 13, § 350, defines a "neglected child" as "any child, who, while under sixteen years of age * *

8. See *Goldberg v. Kelly,* 397 U.S. 254, 262–263, 90 S.Ct. 1011, 1017–1018, 25 L.Ed.2d 287 (1970), where Justice Brennan states that, "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." (Citations omitted.)

9. The drastic nature of summary seizure can be seen in the testimony of the experts. Drs. Provence and Solnit state that "summary removal of a young child from a parent who has been his major caregiver is a severe threat to his development [because] it disrupts and grossly endangers what he most needs, that is, the continuity of affectionate care from those to whom he is attached through bonds of love." These two doctors believe that summary seizure should be resorted to only when the child's "physical survival" is at stake. Dr. Robitscher states that summary seizure is justified in his opinion only when the child's "physical health and emotional health are at serious risk after all other alternatives to removal have been thoroughly studied."

10. See *Golberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) [pre-termination hearing is necessary before a welfare recipient's AFDC benefits are terminated]; *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) [hearing required before replevin of goods in a person's possession]; *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) [informal hearing required before revocation of parole rights]; *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) [hearing required, absent emergency circumstances, prior to the temporary suspension of a student from public school].

has no proper parental care or guardianship or whose home, by reason of neglect, cruelty, or depravity, on the part of his parent or parents, guardian or other person in whose care he may be, is an unfit or improper place for such child." [11] A co-ordinate provision in the Code authorizes a juvenile court to exercise the guardianship of the State over children who fit this description of "neglected." Id. at § 350(4); see also § 352.

As discussed *supra,* the Constitution includes the right to family integrity among the fundamental rights secured to all persons. This right is applied to the States through the Fourteenth Amendment and is accorded strong protection from state interference. States, in the exercise of their inherent police powers, may abrogate such rights only to advance a compelling state interest and pursuant to a narrowly-drawn statute restricted to achieve only the legitimate objective. See, *e. g., Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). It is not disputed that the State of Alabama has a legitimate interest in the welfare of children. Minor intrusions into the affairs of the family may be permitted when the State has reason to believe that a child's best interest is at stake. In such cases, various options and alternatives are available to the State to achieve its objective of child protection. One possibility might be a requirement that the parents attend seminars and weekly counselling sessions on child care and the responsibilities of parenthood. Another situation might warrant supervision of the parents by a welfare counselor or the plac-

ing of a neutral person—such as an aunt—in the home to serve as a bridge between the parents and the child. The State's interest, however, would become "compelling" enough to sever entirely the parent-child relationship only when the child is subjected to real physical or emotional harm and less drastic measures would be unavailing.[12]

Here, the State offered no assistance to Plaintiff Wambles, who was faced with the troubling predicament of raising a young child without the aid of a husband, nor did it explore the possibility of accomplishing its objective of protecting Richard Roe's welfare by use of alternatives other than termination of custody.

The Alabama statute defining "neglected" children sweeps far past the constitutionally permissible range of interference into the sanctity of the family unit. The fact that a home is "improper" in the eyes of the state officials does not necessarily mean that a child in that home is subject to physical or emotional harm.[13]

In *Alsager v. District Court of Polk County, Iowa,* 406 F.Supp. 10, 24 (S.D.Iowa 1975), the court held that "termination must only occur when more harm is likely to befall the child by staying with his parents than by being permanently separated from them." This standard appears to teach that the state's burden is not only to show that the child is being disadvantaged but also to show that the child is being harmed in a real and substantial way. Accordingly, this Court declares Alabama Code, Title 13, §§ 350 and 352 unconstitutional, because it violates the family integ-

11. A "dependent child" is "any child, who, while under sixteen years of age, for any reason, is destitute, homeless, or is dependent on the public for support; or who is without a parent or guardian able to provide for his support, training and education; or whose custody is the subject of controversy." Alabama Code, Title 13, § 350 (1958). Apparently, none of these apply to the present case, and Judge Thetford relied solely on the "neglected child" rubric.

12. It must be emphasized that this standard does not apply to all custody proceedings but only those where the State seeks to assume

custody. In proceedings where the parties have an arguably equal right to custody, such as pursuant to a divorce, a "best interest of the child" standard is entirely appropriate.

13. Although the Alabama Department of Pensions and Security has published a Manual for Administration of Services for Children and Their Families (January, 1969), refining somewhat this definition, the manual is for administrative purposes only and is not binding on the juvenile court judges who ultimately decide these cases.

rity of Margaret Wambles and all other mothers in the class represented by her and the family integrity of Richard Roe and all other children in the class represented by him.

■ This Court holds, as an alternative ground, that the challenged statutory provisions are unconstitutionally vague. We adopt the reasoning and the language of the district court in *Alsager v. District Court of Polk County, Iowa,* supra, which states that,

> Nevertheless, Due Process requires the state to clearly identify and define the evil from which the child needs protection and to specify what parental conduct so contributes to that evil that the state is justified in terminating the parent-child relationship. 406 F.Supp. at 21.

In the present case, not only is the statutory definition of neglect circular (a neglected child is any child who has no proper parental care by reason of neglect), but it is couched in terms that have no common meaning. See *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1956). When is a home an "unfit" or "improper" place for a child? Obviously, this is a question about which men and women of ordinary intelligence would greatly disagree. Their answers would vary in large measure in relation to their differing social, ethical, and religious views. Because these terms are too subjective to denote a sufficient warning to those individuals who might be affected by their proscription, the statute is unconstitutionally vague. See *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

■ *Appointment of Counsel for the Child:* The Plaintiffs maintain that the Alabama child custody procedure violates the due process clause of the Constitution because that procedure does not provide for the appointment of independent counsel to represent a child in a neglect proceeding, and none was appointed here. We agree. Alabama Code, Title 13, §§ 350, *et seq.,* applies not only to "neglected" children but also to "delinquent" children. In this regard, it is similar to the Arizona juvenile delinquency law challenged in *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Under the Arizona procedure, the parents of an infant in a juvenile delinquency proceeding could not be denied representation by counsel of their choosing, but the infant had to rely upon the parents or probation officer to protect his or her interests. The Supreme Court held that

> the Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, the child and his parents must be notified of the child's right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent the child. 387 U.S. at 41, 87 S.Ct. at 1451.

Much the same reasoning applies to a neglect determination proceeding. The juvenile court judge should, however, independently appoint counsel for the child, requiring the parents, if they are financially able, to pay for this legal representation.[14] If the parents are indigent, free counsel should be afforded the child. See *id.*

*Consideration of Race:* Plaintiffs contend that there was a racial animus behind the decision to remove Richard Roe from his mother's custody.[15] It is undisputed that Judge Thetford, at the time he signed the pick-up order, knew only that Margaret Wambles was unemployed, that she and her

---

**14.** In a juvenile delinquency proceeding, having the parents retain counsel for the child normally does not present the same kind of potential conflict as in a proceeding where the parents are accused of abusing the child.

**15.** The Alabama Court of Civil Appeals in its decision, *Wambles v. Coppage,* Civ. No. 746,

filed June 16, 1976, refused to consider the question of whether race influenced Judge Thetford's decision since the appeal was taken from Judge Davis' denial of Plaintiff Wambles' motion for modification of custody and not the original custody order.

child are white, and that they were living in a black neighborhood with a black man to whom Plaintiff Wambles was not married.

While a white child who is part of an interracial family unit and lives in a black neighborhood may be disadvantaged socially or culturally, this fact alone does not rise to the level of harm to the child that is required before the State can terminate the parent's right to custody of the child.[16] Since race per se can never amount to sufficient harm to justify a constitutional termination, this Court finds it unnecessary to decide whether consideration of racial factors by a juvenile court judge represents prohibited racial discrimination.

*Legitimation and Procedural Due Process:* Alabama Code, Title 27, § 11, provides, in pertinent part, as follows:

> The father of a bastard child may legitimate it, and render it capable of inheriting his estate, by making a declaration in writing, attested by two witnesses, setting forth the name of the child proposed to be legitimated, its sex, supposed age, and the name of the mother, and that he thereby recognizes it as his child, and capable of inheriting his estate, real and personal, as if born in wedlock; the declaration being acknowledged by the maker before the judge of probate of the county of his residence, or its execution proved by the attesting witnesses, filed in the office of the judge of probate, and recorded on the minutes of his court, has the effect to legitimate such child   *   *.

Pursuant to this statutory provision, Cecil Coppage, through his attorney, filed a document in the Probate Court of Montgomery County declaring himself to be the father of Richard Roe. No notice or opportunity to be heard was provided to either Plaintiff Roe or Plaintiff Wambles.

Defendant Hobbie testified that, when a declarant and the mother of a child appear together at the Probate Office, the mother, as well as the father, signs the declaration. When, however, the mother does not come in with the declarant, there is no formal procedure for notifying the mother. Nor is there any procedure established for the mother to appear before the probate judge and express her objections when she learns of the declaration and objects to the legitimation. Finally, there is no opportunity in this *ex parte* legitimation proceeding for the interests of the child to be heard.

Legitimation confers benefits on the child and mother by obligating the father to support the child and allowing the child to inherit from the father's estate. One would expect that the usual legitimation proceeding would thus be agreeable to the parties affected. This, however, is not the case in all situations.

The legitimation proceeding is recognized for purposes of establishing fatherhood. See *Bagwell v. Powell,* 267 Ala. 19, 99 So.2d 195 (1958). Thus, as a result of a § 11 declaration, the man can claim the rights of a natural father, which includes the right to withhold consent to the adoption of the child by any person, including a future stepfather. Alabama Code, Title 27, §§ 3, 6. The status of natural father also makes the man a presumptively adequate legal guardian of the child's interests, *Kennedy v. Department of Pensions and Security,* 277 Ala. 5, 7, 166 So.2d 736 (1964), and it puts him in a strong position to claim custody of the child.

Since legitimation might possibly be adverse to the interests of the mother and her illegitimate child in the exercise of their family integrity, the Fourteenth Amendment's guarantee of procedural fairness must apply. The question then becomes, what process is due? As Justice Harlan, writing in *Boddie v. Connecticut,* 401 U.S. 371, 380, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), has said, the states' obligation under the due process clause is not a fixed

---

**16.** Neither is the fact that the parent is living with someone to whom he or she is not married. "Immorality" of the parent, without a showing that the child is being physically or emotionally harmed in a real way, is not sufficient justification for the State to terminate a parent-child relationship.

quantum of rights but the process due under the circumstances.

█ Here, at a minimum, due process requires notice to the mother before legitimation takes effect. Such notice should inform the mother that she has a reasonable period of time within which to notify the Probate Court if she objects to the legitimation. Upon being so notified, the Probate Court should appoint a guardian ad litem to represent the child and should conduct an informal hearing at which all interested parties could present evidence for determination of whether legitimation is in the best interest of the child.

█ *Failure to Leave a Copy of the Pick-up Order with Margaret Wambles:* Plaintiffs assert that the failure of Defendant Conn to leave a pick-up order with Plaintiff Wambles violated Title 13, § 352(5) of the Alabama Code, which requires delivery of a summons to the custodian of the child. While undoubtedly, Defendant Conn's actions were not in conformity with the dictates of the statute, we find that such violations do not give rise to an independent cause of action, cognizable under state law, over which this forum would have pendent jurisdiction. Plaintiffs' remedy for this violation should have been pursued in the original custody proceeding.

*Name Change and Procedural Due Process:* In connection with the legitimation procedure set out in Title 27, Code of Alabama, section 12 provides:

> The father may, at the same time, change the name of such child, setting in his declaration the name it is then known by, and the name he wishes it afterwards to have.

Pursuant to this provision, Defendant Coppage, as part of his declaration of fatherhood, changed Plaintiff Roe's last name from Wambles to Coppage.[17] As with the legitimation procedure, the question is whether Title 27, § 12 violates due process by permitting a declarant to change a child's name without providing the mother and/or the child notice and an opportunity to be heard.[18]

In an earlier order filed March 8, 1976, on Defendant Hobbie's motion to dismiss, this Court rejected his contention that a parent's interest in the name of a minor child does not constitute a "property" right within the meaning of the due process clause. Persuasive opinions are two Texas decisions, *Eschrich v. Williamson,* 475 S.W.2d 380 (Tex.Civ.App.1972); *Scucchi v. Woodruff,* 503 S.W.2d 356 (Tex.Civ.App.1972), which have gone so far as to hold that the notice required by due process should be read into the Texas statute allowing for the name change of a minor.

█ The challenged statute, purporting to be concerned with the best interest of the child, at the same time denies the opportunity to show factors bearing on that issue. The statute presumes a fact—that the child's best interest will be served by his bearing the name of the declared father—which is not necessarily or universally true. Due process requires an individual determination as to the appropriateness of the name change. To enable the probate judge to make this determination, notice and an opportunity to be heard must be given to the mother and to the child before a name change takes effect.

█ *Name Change and Sex Discrimination:* Plaintiffs contend that Title 27, § 12 works a discrimination on the basis of sex by permitting the declared father to control the child's name, irrespective of the wishes of the natural mother whose name the child has carried since birth. Surnames give an individual a personal identity and selfawareness. It seems clear that Plaintiff Roe has a "liberty" interest at stake when

17. Plaintiff Roe was born out of wedlock, no information relative to his father was entered on his birth certificate, and he was given the surname of his mother. Alabama Code, Title 22, § 33 (1958).

18. Title 27, § 12, has not been construed in any published cases, but the procedure followed in the present cases indicates that a notice requirement has not been read into the statute.

his name is altered. Furthermore, the name change touches on this right to maintain the integrity of established family relations. This preference for the wishes of the father cannot be said to serve a legitimate state interest in administrative convenience or avoiding confusion. See *Forbush v. Wallace,* 341 F.Supp. 217 (M.D.Ala.1971) (three-judge court). The name change imposes the administrative burden of changing all the child's vital records, a measure which might possibly lead to confusion.[19]

■ This Court concludes that there is no rational basis for the state's policy of giving to the declared father complete control over the child's name. For this reason, we find that Title 27, § 12 violates the equal protection clause of the Fourteenth Amendment. In changing a child's name pursuant to a declaration of father, the State should be directed not by the desires of the father but by the best interest of the child.

■ *Failure of Defendants to Comply with the Statute:* Alabama Code, Title 27, § 11 provides that the father of an illegitimate child must make his declaration of fatherhood before the judge of probate of "his" residence. While the statute is not altogether free from ambiguity ("his" residence could mean the child's), apparently the Legislature was referring to the residence of the father.[20] Yet, in the present case, Defendant Coppage, a resident of Pike County, Alabama, filed his declaration in the Probate Court of Montgomery County, Alabama. Plaintiffs, however, have not established that this violation of the venue provisions of Title 27, § 11 gives rise to an independent cause of action against Defendant Coppage that may be asserted in a collateral proceeding in federal court. Like the failure of Defendant Conn to leave a copy of the pick-up order, this procedural error is cognizable only in the original proceeding in the state court.

## APPENDIX A

THE STATE OF ALABAMA _____ JUDICIAL DEPARTMENT

IN THE SUPREME COURT OF ALABAMA

OCTOBER TERM 1975–76

RESOLUTION AND ORDER
CREATING
AN ADVISORY COMMITTEE
TO MAKE
RECOMMENDATIONS FOR
RULES OF ADMINISTRATION, PRACTICE AND PROCEDURE
IN JUVENILE COURTS

WHEREAS, the Supreme Court of Alabama, in reviewing Act No. 1205, Acts of Alabama 1975, approved October 10, 1975, concludes that Article 5 shall become effective January 16, 1977, statutory provisions currently effective remaining in full force and effect until that time; and

WHEREAS, the effectuation of Article 5 of said Act No. 1205 on the effective date

requires the Supreme Court to promulgate certain rules of practice and procedure as set forth throughout Article 5 of said Act No. 1205; and

WHEREAS, said Act No. 1205 and Article 6, Section 150 of the Constitution of Alabama, as amended, conferred upon the Supreme Court of Alabama the authority to

---

19. Furthermore, since *Forbush* was decided, the Supreme Court, in *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) and *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), has made clear that the state's interest in achieving administrative efficiency is, alone, not enough to support a sex-based classification.

20. Who would always be a "he," which is not necessarily the case with the child.

784

■■■■■■■■

promulgate rules of administration, practice and procedure; and

WHEREAS, the Supreme Court wishes to appoint an advisory committee to make recommendations for rules of administration, practice and procedure for juvenile cases;

NOW, THEREFORE, BE IT ORDERED by the Supreme Court of Alabama, on this 1st day of December, 1975, as follows:

(1) That an Advisory Committee on Juvenile Justice be, and hereby is, created, with the following membership as indicated hereafter:

Dr. Annette Dodd, Cumberland School of Law, Birmingham—Chairperson

Judge James Strickland, Mobile

Judge G. Ross Bell, Birmingham

Judge James Buck, Tuscaloosa

Judge James Brotherton, Jasper

Judge William Sanford, Opelika

Judge Jerry Vanderhoef, Tuscumbia

Honorable Robert M. Hill, Jr., Florence

Honorable Fred D. Gray, Montgomery

James Lavender, Dept. of Youth Services, Montgomery

Dr. Wayne Teague, State Superintendent of Education, Auburn

Dr. Thomas F. Staton, Chairman, Board of Corrections, Montgomery.

(2) That said advisory committee report to the Supreme Court with recommendations concerning a set of rules for administration, practice and procedure in juvenile courts on or about June 1, 1976.

All Justices concur.