902 So.2d 89 (2004)
J.S.M.
v.
P.J.
2030812.
Court of Civil Appeals of Alabama.
December 3, 2004.
*90 Roy O. McCord of McCord & Martin, Gadsden, for appellant.
Sheila C. Field of Field, Field, Starr & Williamon, LLC, Anniston, for appellee.
PER CURIAM.
On December 31, 2003, P.J. filed a petition seeking custody of A.H.M. ("the child"). Attached to her petition, P.J. filed affidavits that alleged facts indicating that the child was a dependent child, as defined under § 12-15-1(10), Ala.Code 1975. P.J. is not related to the child. The child, who was almost 14 years old at the time of the hearing in this matter, had resided with P.J. for approximately 13 years. At the time P.J. filed her petition, the child had been living for several days with his father, J.S.M. ("the father").
The father filed a motion to strike P.J.'s pleadings and affidavits, and he moved to dismiss the petition for custody; the father did not file an answer to P.J.'s petition. *91 On April 13, 2004, the trial court[1] conducted a hearing at which it received ore tenus evidence. At the beginning of that hearing, the trial court denied the father's motion to strike and the father's motion to dismiss P.J.'s December 31, 2003, petition. On May 4, 2004, the trial court entered a judgment in which it found the child to be dependent, awarded custody of the child to the father, and awarded P.J. visitation with the child. The father filed a postjudgment motion;[2] that motion was denied by operation of law. See Rule 59.1, Ala. R. Civ. P.; Rule 1(B), Ala. R. Juv. P. The father timely appealed.
Initially, we note that the father argued before the trial court that if the trial court considered the matter as a dependency action, it should only consider the issue whether the child was dependent after December 31, 2003, the date on which P.J. filed her petition seeking custody of the child. P.J. did not object to that argument. The trial court ultimately ruled that it would hear the action as a dependency action and that it would consider only evidence pertaining to the issue of the child's dependency after the December 31, 2003, date of filing of P.J.'s petition.[3] During the hearing, the father occasionally objected to questions pertaining to facts or events that occurred before December 31, 2003, and the trial court sustained those objections. However, the father failed to object to the introduction of other testimony, predominantly that given by the child, that pertained to events that occurred before December 31, 2003.[4] Therefore, this opinion includes a recitation of the evidence to which the father failed to object.
The record on appeal indicates that before the dispute that forms the basis of this appeal the child had lived for virtually all of his life with P.J. It appears that the child's mother left the father and the child shortly after the child's birth; the mother was not a party to this action. At the time of the hearing in this matter, the child was almost 14 years old and had lived with P.J. since he was 4 months old. The father had executed some guardianship papers in favor of P.J. so that she would have the authority to take actions such as obtaining medical treatment for the child. The father did not sign documents transferring custody of the child to P.J., and no court *92 order exists that awards P.J. custody of the child.
P.J. testified that the father took custody of the child on Saturday, December 27, 2003; it appears from the record that both P.J. and the child believed that the child was merely going to visit the father for the weekend. P.J. and the child each testified that the child called P.J. from church on Sunday, December 28, 2003, and that, after the child informed P.J. of the father's intention not to return him to P.J.'s home, the child asked P.J. to come to the church to pick him up. P.J. went to the church, and a dispute arose between P.J. and the father. P.J. testified that the father informed her that her services as the child's "babysitter" were no longer required. The child testified that he ran away from the church and that some friends took him to P.J.'s home. The police interceded at P.J.'s home, and, after the child had run away again and had again been recovered, the officers persuaded the child to leave with the father.
P.J. alleged that the child was afraid of the father; she specifically stated that the child was shaking and upset during the December 28, 2003, incident. P.J. testified that after December 28, 2003, the child had to sneak out of the father's home in order to contact her by telephone. P.J. also testified that during their telephone conversations the child had told her that he was unhappy living with the father and that the child had cried.
The father testified that he took the child from P.J. because he believed that P.J. was exploiting both the child and him; the father alleged that P.J. wanted the child to take care of her as she grew older. The father also alleged that P.J. had isolated the child and that the child had no friends outside of school. The father denied P.J.'s accusations that he drank to excess. The father testified that the child had never seen him intoxicated and that he had never struck the child; the child confirmed that testimony. The father stated that the child seemed happy to be living with him and that he had noticed no signs of any separation anxiety being expressed by the child as a result of being removed from P.J.'s home. The father testified that he thought that P.J. was lying when she asserted that the child was sneaking out of the father's home in order to contact her by telephone.
At the time of the hearing in this matter, the father had been married to his third wife, B.R.M. ("the wife"), for approximately two years. The father and the wife live in a house that has four bedrooms and an office. The wife testified at the hearing and stated that during her marriage to the father the child had visited the father's home once every two to three weeks. The wife testified that, although the child had been uncomfortable living with her and the father for the first few weeks, at the time of the hearing the child appeared to be happy in their home. The wife stated that the child had been living with her and the father for 110 days at the time of the hearing; she agreed that at the time of the hearing the child was approximately 4,745 days old.
The wife testified that the child attended church regularly and that she and the father limited the time the child could use the Internet to two hours each night. The wife testified that she had offered to allow the child to use the telephone on a number of occasions but that she had not specifically mentioned that he could call anyone in particular. The wife stated that there was no reason the child would have to sneak out of the house in order to contact P.J.
The child is an excellent student; he maintained his grades when the move to his father's home necessitated a change in schools. The child is also proficient at *93 using a computer, and he assists in managing an Internet Web site. The child testified that he had played soccer for two years while living with P.J. but that he had lost interest in soccer. The child also stated that while he had made new friends at his new school he had more friends at his old school.
The child testified that he had lived with P.J. for almost his entire life, that he considered her home to be his home, and that he wanted to live with P.J. rather than with the father. According to the child, P.J. lives in a mobile home in which he has his own room; he stated that P.J. had provided him a comfortable home and adequate meals and clothing. The child testified that he had to sneak out of the father's home to telephone P.J. because the father and his wife had prohibited him from contacting P.J.; he also stated that the father had told him that he would never see or speak to P.J. again.
According to the child, before December 28, 2003, he had visited with the father "sporadically." The child testified that he typically visited with the father every two or three weeks on Sunday. As the father points out in his brief on appeal, the child also stated that in 1999 the father started "forcing" the child to "live with" the father on weekends. The child explained his reluctance to live with the father on weekends by stating that "[the father] had never been there for me, so why start now?"
It is not clear from the record for what period of time the child spent entire weekends with the father. According to the child, he visited the father every few Sundays until 1999. Also, the child, in speculating on why the father had not given him any gifts for Christmas 2003, stated that he and the father had not seen each other much that year. The testimony of the father's wife also indicates that the father visited the child only every two to three weeks during their marriage; the father and the wife had been married for approximately two years at the time of the April 13, 2004, hearing in this matter.
The child testified that he had been frightened of the father in the past because the father had threatened him with never seeing P.J. again; he stated that the father had not acted on those threats until December 2003. Although the child testified that he was not, at the time of the hearing, afraid of the father, he testified that the father has a temper and has yelled at him and called him names. The child testified that the father's wife had interceded on the child's behalf and that the father had not lost his temper recently.
On questioning by the trial court, the child testified that if the trial court were to award custody to the father, he would want to be allowed to see P.J. as much as possible but that he did not know if the father would ever allow him to maintain a relationship with P.J.
In his brief on appeal, the father repeatedly refers to P.J. as a "babysitter" or a "nanny," who the father repeatedly characterizes as being "well compensated." The evidence in the record indicates that the father had originally paid P.J. $200 per month to care for the child but that he was paying P.J. $500 per month until shortly before she filed her petition in this matter. It is clear, however, that before December 2003 the child lived with P.J. and visited the father only occasionally.
The "summary of the argument" portion of the father's brief on appeal contains six headers indicating that the father purports to raise six separate issues on appeal. However, the argument portion of the father's brief on appeal is not similarly organized and does not contain six separate arguments. In this opinion, we have done our best to address those issues contained *94 in the "argument" portion of the father's brief on appeal. We also note that in his reply brief the father characterizes the issues raised in his original brief submitted to this court in much the same manner as those issues are addressed in this opinion.
The father argues that the trial court erred in refusing to dismiss P.J.'s petition because, he insists, P.J. conceded that she did not have standing to prosecute her petition. At the beginning of the hearing, the father argued before the trial court that the evidence did not support a finding of dependency, and, in the alternative, he argued that if the matter were considered as a custody dispute, P.J. did not have standing to assert a claim for custody of the child. In response, P.J.'s attorney replied, in pertinent part:
"[P.J.]  as far as not being a blood relative, you are absolutely right. We have no standing. We will stipulate to that. We do not have any standing except for what [the father] has given us over the last thirteen years. He put a four-month-old baby in her care and left the child with us for thirteen years and then gave us legal guardianship, which we have just attached that  just one of several over the years that he has given us. He gave us guardianship and legal custodianship over this child for thirteen years. We are alleging that we do, under [the father's] own hands, have rights to custody of this child.
"This child calls [P.J.] `mother.' That is the only person that has ever raised him. He has never been apart from this household that he has been taken out of. And we would like an opportunity to prove dependency through the child's testimony and also to establish that he is living in an unfit household."
Section 12-15-52(a), Ala.Code 1975, provides that a petition alleging the dependency of the child may be filed by "any person who has knowledge of the facts." P.J.'s petition alleged that she had knowledge of the facts of this matter, and the facts as alleged in that petition were sufficient for the trial court to consider this matter as a dependency action. Further, a fair reading of P.J.'s argument on the issue of standing indicates that, although she stipulated that she did not have standing to seek custody as a relative of the child, she argued that she did have standing because the circumstances of the case indicated that the father's actions had rendered the child dependent under § 12-15-1(10), Ala.Code 1975. We disagree with the father's argument that P.J. stipulated that she had no standing to prosecute her petition.
Further, when a trial court finds from clear and convincing evidence that a child is dependent, it may make a "proper disposition of the case." § 12-15-65(f), Ala. Code 1975. See also § 12-15-71, Ala.Code 1975 (providing that once a child is determined to be dependent, a court may make any of a number of dispositions in order to protect the child). Thus, contrary to the father's assertions on appeal, after finding the child to be dependent, the trial court could have awarded custody of the child to P.J. § 12-15-71(a), Ala.Code 1975. We cannot say that the father has demonstrated that P.J. did not have standing to prosecute her December 31, 2003, petition.
The father also argues in his brief on appeal that the trial court lacked the authority to award visitation to P.J. because in her petition P.J. did not specifically request an award of visitation if she was not awarded custody of the child. However, as already stated, after making a dependency determination, the trial court also had the authority to make an appropriate disposition of the case. One appropriate disposition for a dependent child is *95 to place the child with his or her parent or parents, "subject to conditions and limitations as the court may prescribe." § 12-15-71(a)(1), Ala.Code 1975. Another authorized disposition for a dependent child is for the trial court to "[m]ake any other order as the court in its discretion shall deem to be for the welfare and best interests of the child." § 12-15-71(a)(4), Ala. Code 1975.
Thus, because the trial court found the child to be dependent, an award of visitation to P.J. was appropriate if the trial court determined such an award to be in the child's best interests. Although P.J. did not expressly request an award of visitation, the child, on questioning by the trial court, asked that he be allowed to visit P.J. as often as possible. The father does not argue in his brief on appeal that the evidence does not support a finding that the child's best interests would be served by allowing the child to visit with P.J. Moreover, our review of the record indicates that the visitation award does serve the child's best interests.
The father contends that the evidence does not support the trial court's finding that the child is dependent. In his brief on appeal, the father makes no specific argument citing specific facts or evidence that he contends renders the trial court's judgment unsupported by the evidence. The father asserts in his brief on appeal that he has always provided for the child and has "been concerned" with the child's best interests. He also argues that the trial court improperly substituted its judgment for his judgment.[5]
A finding of dependency must be supported by clear and convincing evidence. § 12-15-65(f); M.M.S. v. D.W., 735 So.2d 1230, 1233 (Ala.Civ.App.1999). However, matters of dependency are within the sound discretion of the trial court, and a trial court's ruling on a dependency action in which evidence is presented ore tenus will not be reversed absent a showing that the ruling was plainly and palpably wrong. R.G. v. Calhoun County Dep't of Human Res., 716 So.2d 219 (Ala.Civ. App.1998); G.C. v. G.D., 712 So.2d 1091 (Ala.Civ.App.1997); and J.M. v. State Dep't of Human Res., 686 So.2d 1253 (Ala. Civ.App.1996).
In its May 4, 2004, judgment in which it determined the child to be dependent, the trial court found:
"[T]he child ... is dependent under Alabama Code § 12-15-1(10)c. in that the child has not been in the physical custody of either parent for thirteen (13) years and was in the physical custody of a nonrelative during this time until the father removed him on December 28, 2003. The Court further finds that the child is dependent under § 12-15-1(10)j., in that the child is suffering emotionally due to his change of environment without any transitional period. This emotional turmoil is evidenced through his testimony and demeanor in court. Although this child is [of] above-average intelligence and somewhat mature, he is emotionally unstable due to the circumstances of this case and lack of any contact with [P.J.]."
*96 In pertinent part, § 12-15-1(10)j., Ala. Code 1975, defines the term "dependent child" as a child
"[w]ho is physically, mentally, or emotionally abused by the child's parents, guardian, or other custodian or who is without proper parental care and control necessary for the child's well-being because of the faults or habits of the child's parents, guardian, or other custodian or their neglect or refusal, when able to do so, to provide them."
It is clear from the record that although the father attempts to characterize P.J. as a "babysitter" or a "nanny," the child had been left with P.J., a nonrelative, with whom the child had resided for approximately 13 years. During that time, the father paid P.J. some support for the benefit of the child and, according to the child, had visited the child "sporadically." Further, the evidence supports a conclusion that the child had formed a strong emotional bond with P.J.; the child testified that he considered P.J.'s home to be his home and that he wanted to continue to live with P.J. In December 2003, the father abruptly refused to return the child to P.J.'s home, and, according to the child and P.J., the father did not allow the child to contact P.J. P.J. testified that the child often cried when he called her after sneaking out of the father's home.
The trial court received ore tenus evidence and was in the best position to observe the child and the other witnesses while they testified and to evaluate their demeanor and credibility. Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986). Therefore, its determinations based on that evidence are entitled to a presumption of correctness on appeal and will not be reversed absent a showing that they are clearly erroneous. Ex parte Anonymous, 803 So.2d 542, 546 (Ala.2001). Given the evidence and the trial court's personal observation of the child as he testified, we cannot say that the father has demonstrated that the trial court erred in finding the child to be dependent.
The father also raises constitutional issues in his brief on appeal. We note that the father did not raise those issues before the trial court. Out of an abundance of caution, however, we will briefly address those issues together.
The father argues that if this court rules that P.J. has standing in this matter to seek custody or visitation rights, the effect of such a holding would be to "unconstitutionally expand" the class of persons who can petition for custody or visitation with a child. The father's arguments with regard to these constitutional issues, however, are not relevant to the facts of this case. We have already concluded that the trial court properly considered this action as a dependency action and that P.J. had standing because the action is one concerning the dependency of a child. Thus, because P.J.'s standing is conferred by the dependency statutes, the trial court's ruling awarding P.J. visitation with the child does not expand the class of people who may seek custody of or visitation with the child. Rather, the trial court's ruling seems to serve the child's best interests and welfare, as is required by the dependency statute. See § 12-15-71(a)(4), Ala.Code 1975.
The father also contends that the trial court's award of visitation to P.J. violates his due-process rights to decide with whom his child visits or has contact. In making those arguments, however, the father insists that this action is one in the nature of a custody dispute rather than a dependency action. For example, the father cites, in support of his due-process argument, several cases in which courts have considered the validity of specific *97 statutes that allow a grandparent to seek visitation rights with their grandchildren over the objection of a custodial parent. See Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); T.R.S.S. v. R.S., 828 So.2d 327 (Ala.Civ.App.2002). This case, however, involves the dependency statutes rather than a statute affording a right to visitation to a relative over the objection of a custodial parent. In this case, because the trial court properly determined the child to be dependent, under the dependency statute, P.J. could properly be awarded visitation with the child in the event the trial court determined that such an award would serve the child's best interests. See § 12-15-71(a)(1) and (4), Ala.Code 1975. The father has failed to demonstrate a violation of his due-process rights with regard to the dependent child in this case. Given the foregoing, we cannot say that the father has demonstrated error with regard to the constitutional issues he raised in his brief on appeal.
The father's motion to strike the appellee's brief for failure to comply with Rule 28(a)(7) and (10), Ala. R.App. P., is denied. See Rule 28(b), Ala. R.App. P.
MOTION TO STRIKE DENIED; AFFIRMED.
YATES, P.J., and CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.
MURDOCK, J., concurs specially, with writing.
MURDOCK, Judge, concurring specially.
I fully concur with the well-reasoned responses in the main opinion to the substantive arguments raised by the father.
The main opinion disposes of the father's substantive "standing" and constitutional arguments by focusing on the fact that this is a dependency case. I write separately to note that I do not read the analysis of the main opinion in this regard to negatively imply that the father's arguments would necessarily yield a better result for him if this case were treated as a "mere" custody dispute. Alabama law clearly provides that a natural parent may lose his or her presumptive custodial rights, and have no greater "status" (which I believe is preferable to the word "standing" in this context) to claim full or partial custody of a child than a nonparent, where he or she has abandoned or voluntarily forfeited custody of the child, or where the parent's unfitness has been demonstrated by or has resulted from such an abandonment or forfeiture. See Ex parte Terry, 494 So.2d 628 (Ala.1986); Ex parte McLendon, 455 So.2d 863 (Ala.1984); R.K. v. R.J., 843 So.2d 774 (Ala.Civ.App.2002); C.P. v. W.M., 837 So.2d 860 (Ala.Civ.App.2002); and D.C. v. C.O., 721 So.2d 195 (Ala.Civ.App.1998). The same is true of parents' federal constitutional rights. See R.K., 843 So.2d at 780-82; D.M.P. v. Shelby County Dep't of Human Res., 871 So.2d 77 (Ala.Civ.App.2003) (plurality opinion) (discussing and quoting from Roe v. Conn, 417 F.Supp. 769 (M.D.Ala.1976)). See also L.B.S. v. L.M.S., 826 So.2d 178, 187-99 (Ala.Civ.App.2002) (Murdock, J., concurring in the judgment of reversal only); R.S.C. v. J.B.C., 812 So.2d 361, 367-72 (Ala.Civ.App.2001).
Finally, I note that P.J. does not appeal from the trial court's custody determination and that determination therefore is not before us.
NOTES
[1] The father is an attorney who practices in Etowah County, and the father's wife works within the court system. Therefore, all of the district and circuit court judges in that county recused themselves from this matter. The acting Chief Justice of the Supreme Court of Alabama appointed a judge from another county to preside over this matter.
[2] In support of his postjudgment motion, the father submitted an affidavit setting forth additional testimony regarding matters about which he could have presented evidence during the ore tenus hearing, as well as matters that he alleged occurred after that hearing. Nothing in the record indicates that the trial court considered that affidavit as evidence; therefore, this court does not refer to the testimony in that affidavit in setting forth the facts in this opinion.
[3] P.J. did not challenge that ruling before the trial court or on appeal. Therefore, this court does not address the propriety of that ruling.
[4] The father mentions in his brief on appeal that the trial court had said that it would not consider evidence pertaining to events that occurred before December 31, 2003. As already indicated, however, the father failed to object to much of the testimony that was offered that pertained to events occurring before December 31, 2003. This court may not hold a trial court in error for matters about which the father failed to object. Bostrom Seating, Inc. v. Adderhold, 852 So.2d 784, 794 (Ala.Civ.App.2002). Further, in his brief on appeal, the father makes no specific argument that is properly supported by citations to authority that tends to indicate that the trial court erred in considering that evidence.
[5] In making this argument, the father maintains that he is the child's "legal custodian" as that term is defined in § 12-15-1(16), Ala. Code 1975. However, a "legal custodian" is defined by our legislature in the Alabama Code as "[a] person, agency, or department, other than a parent or legal guardian, to whom legal custody of the child has been given by court order or who is acting in loco parentis." § 12-15-1(16) (emphasis added). The father is a parent of the child; therefore, we reject the father's argument that he was the child's "legal custodian" as that term is defined in § 12-15-1(16), Ala.Code 1975.