John Pleasant SIMS et al., Plaintiffs,

v.

STATE DEPARTMENT OF PUBLIC WELFARE OF the STATE OF TEXAS et al., Defendants.

Dorothy Mae WOODS et al., Plaintiffs,

v.

Raul JIMENEZ et al., Defendants.

Civ. A. Nos. 76–H–665 and 76–H–1120.

United States District Court,
S. D. Texas,
Houston Division.

Oct. 12, 1977.

---

Gladys R. Goffney, Nell H. Holloway, Jerry L. Gardner, Martin J. Grimm, J. Patrick Wiseman, Nicolas R. Serna, Houston Legal Foundation, Houston, for plaintiffs.

Frank C. Cooksey, Colin J. Carl, Asst. Attys. Gen., Austin, for defendants.

Before INGRAHAM, Circuit Judge, and SINGLETON and STERLING, District Judges.

SINGLETON, District Judge:

This civil action is a challenge to the constitutionality of portions of Chapters 11, 14, 15, 17, and 34, Title 2, Texas Family Code, seeking declaratory, injunctive, and monetary relief. The plaintiffs in the *Sims* case are two adult parents and their three

minor children who seek relief from the actions of the Harris County Child Welfare Unit of the State Department of Public Welfare. Additionally, the case of *Woods v. Jimenez,* Civil Action No. 76–H–1,120, pending in this district, was consolidated with the *Sims* case solely on the issue of the right of indigent parents to counsel in suits for the termination of the parent-child relationship.

Pursuant to 28 U.S.C. §§ 2281, 2284, a three-judge district court was convened to determine the constitutional issues. The court has carefully considered the extensive briefs, the arguments of counsel, and the evidence presented, and concludes that the case is properly before the court for determination, that certain portions of the Texas Family Code are violative of minimal constitutional standards, and that appropriate declaratory and injunctive relief is necessary.

The threshold issue is that of abstention in light of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), *Huffman v. Pursue, Ltd.;* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), and *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977). Having viewed the instant case with an eye to the notions of comity and federalism which underlie *Younger's* policy of equitable restraint, this court concludes that abstention is not warranted and would be improper under the unique and compelling circumstances of this case.

A chronology of the events which precipitated the filing of this suit is necessary. In March, 1976, the Sims children lived with their parents in Montgomery County, Texas, and attended the John G. Osborne Elementary School in the Houston Independent School District, located in Harris County, Texas. On March 25, 1976, the Harris County Child Welfare Unit received a telephone report from the school that Paul Sims was possibly the victim of child abuse. In response to that call, caseworker Rex Downing visited the school and, on the same date, took possession of the three Sims children pursuant to Section 17.01 of Title 2 of the Texas Family Code.[1] The next day, March 26, the Child Welfare Unit instituted a "Suit for the Protection of a Child in an Emergency" pursuant to Chap-

---

1. The relevant sections of Chapter 17 of the Texas Family Code are as follows:

*Section 17.01. Taking Possession in Emergency.*

An authorized representative of the State Department of Public Welfare, a law-enforcement officer, or a juvenile probation officer may take possession of a child to protect him from an immediate danger to his health or physical safety and deliver him to any court having jurisdiction of suits under this subtitle . . . . The child shall be delivered immediately to the court.

*Section 17.02. Hearing.*

Unless the child is taken into possession pursuant to a temporary order entered by a court under Section 11.11 of this code, the officer or representative shall file a petition in the court immediately on delivery of the child to the court, and a hearing shall be held to provide for the temporary care or protection of the child.

*Section 17.03. Notice.*

The proceeding under Section 17.02 of this code may be held without notice.

*Section 17.04. Grounds and Disposition.*

On a showing that the child is apparently without support and is dependent on society for protection, or that the child is in immediate danger of physical or emotional injury, the court may make any appropriate order for the care and protection of the child and may appoint a temporary managing conservator for the child.

*Section 17.05. Duration of Order.*

(a) An order issued under Section 17.04 of this code expires at the end of the 10-day period following the date of the order, on the restoration of the child to the possession of its parent, guardian, or conservator, or on the issuance of ex parte temporary orders in a suit affecting the parent-child relationship under this subtitle, whichever occurs first.

(b) If the child is not restored to the possession of its parent, guardian, or conservator, the court shall:

(1) order such restoration of possession; or

(2) direct the filing of a suit affecting the parent-child relationship in the appropriate court with regard to continuing jurisdiction.

*Section 17.06. Modification.*

On the motion of a parent, managing conservator, or guardian of the person of the child, and notice to those persons involved in the original emergency hearing, the court shall conduct a hearing and may modify any emergency order made under this chapter if found to be in the best interest of the child.

ter 17, which was filed in Juvenile Court Number One of Harris County, Texas, Cause No. 38,295, and concerned all three of the Sims children. Also on March 26, 1976, Judge Robert L. Lowry of the Harris County Juvenile Court issued an ex parte order pursuant to Section 17.04, which has the effect of removing the children from the custody of their parents. Section 17.05 provides that such an order is of ten days in duration, and, upon the expiration of the order, the court is required to either order the restoration of the children to their parents or direct that a "Suit Affecting the Parent-Child Relationship" be filed.

On March 31, 1976, the plaintiff-parents sought to present to Judge Lowry a motion for modification of the March 26 Order, pursuant to Section 17.06. Although that section requires that a hearing be held on the motion, no hearing was in fact held. Rather, evidence before this court on May 5, 1976, indicates that the motion was not presented to Judge Lowry because of his temporary absence and was returned to counsel for the parents. Later on March 31, 1976, counsel for the parents filed with the Juvenile Court Number One, a petition for a writ of habeas corpus, Cause No. 1,069,341.

On April 5, 1976, a hearing was held before Judge Lowry on the parents' petition for a writ of habeas corpus. This was the first time since their seizure that the children were brought before the court for any hearing and the first time the parents were given any opportunity to appear. However, the merits of the dispute were never addressed. At the April 5 hearing, Judge Lowry determined that the children were residents of Montgomery County and, de-

spite their custody in Harris County, transferred the matter to Montgomery County. Later on April 5, at Judge Lowry's direction pursuant to Section 17.05(b)(2), the Harris County Child Welfare Unit filed a "Suit affecting the parent-child relationship" in *Harris* County. This second petition by the current defendants was filed in the same Cause No. 38,295 as the original emergency suit filed under Chapter 17. Finally, on April 5, 1976, Judge Lowry issued another ex parte temporary order pursuant to Section 11.11.[2] The order directed that the children continue in the possession of the Harris County Child Welfare Unit and purported to set a hearing upon its expiration. However, the order setting the hearing was entered in blank and to date the blanks have never been completed.

On April 6, 1976, the "Suit affecting the parent-child relationship" (Cause No. 38,-295), which supplanted the emergency suit, and the habeas corpus action (Cause No. 1,069,341) were officially transferred to the District Court of Montgomery County and assigned to the docket of Judge Ernest A. Coker, Sr. The transfer was apparently made *sua sponte* under Section 11.06(a) despite the requirement that it be transferred upon a timely motion.[3] It is stipulated that from April 6, 1976, to May 5, 1976, when the first hearing was conducted in this action, no notice, citation or process of any kind was served upon the plaintiff-parents with regard to the Montgomery County cases, nor were they afforded a hearing of any kind before the District Court of Montgomery County. During the entire time, the children remained in the custody of the Harris County Child Welfare Unit.

---

**2.** *Section 11.11. Temporary Orders.*

(a) In a suit affecting the parent-child relationship, the court may make any temporary order for the safety and welfare of the child, including but not limited to an order:

. . . . .

(4) taking the child into the possession of the court or of a person designated by the court;

. . . . .

(b) Temporary orders under this section are governed by the rules governing temporary re-

straining orders and temporary injunctions in civil cases generally.

**3.** *Section 11.06. Transfer of Proceedings.*

(a) If venue is improperly laid in the court in which a suit affecting the parent-child relationship is filed, and no other court has continuing jurisdiction of the suit, the court, on the timely motion of any party other than the petitioner, and on a showing that venue is proper in another county, shall transfer the proceeding to the county where venue is proper.

On April 19, 1976, the plaintiffs filed their Original Complaint in federal court. On May 4, 1976, the plaintiffs filed a motion for leave to file an original petition for a writ of habeas corpus with the Texas Court of Civil Appeals for the 14th District, which was denied on the same date. The next day, the managing judge of the three-judge district court conducted an evidentiary hearing at which the court found that the children were not in the legal custody of the defendants because the ex parte temporary order under Chapter 17, dated March 26, and the ex parte order under Section 11.11, dated April 5, had both expired. The court ordered that the Sims children be returned to their parents, but did not enjoin the Department of Public Welfare from taking action under state law to properly establish a temporary conservatorship over the children. Therefore, on May 14, 1976, the Department of Public Welfare filed another "Suit affecting the parent-child relationship" in the Juvenile Court of Montgomery County. This action concerned Paul Sims only.

The Juvenile Court on May 14, 1976, established a temporary managing conservatorship for the child and set a hearing for May 21. On May 21, upon the motion of the plaintiffs, the managing judge of the three-judge panel temporarily enjoined the hearing in Montgomery County. Subsequently, after a hearing, the three-judge court extended the restraining order and enjoined any further state proceeding under the challenged statutes pending determination of the plaintiffs' constitutional challenges.

## I. ABSTENTION ISSUE

█ As a preliminary matter, the parties are in dispute as to whether there is a pending state action. Although the Chapter 15 action filed on May 14, 1976, was obviously not pending on the date the federal action was instituted, the original "Suit affecting the parent-child relationship" which was filed on April 5, 1976, and transferred to Montgomery County from Harris County on April 6 was pending on April 19

and, along with the action filed on May 14, remains on the docket of the District Court of Montgomery County. The plaintiffs' argument that there is no pending proceeding because the temporary orders have expired is therefore without merit. *See Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). Although, as we note *infra*, there is no pending state judicial proceeding with regard to some aspects of the plaintiffs' complaint, abstention must still be addressed because of the proceeding filed on April 5, 1976.

The extent to which *Younger* principles apply to a case where the pending state action is civil in nature is still unclear. The first acknowledged extension of *Younger* to civil cases involved a nuisance proceeding which was "more akin to a criminal prosecution than are most civil cases." *Huffman v. Pursue, Ltd., supra*, 420 U.S. at 604, 95 S.Ct. at 1208. However, more recently, in *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), and in *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977), the Supreme Court extended the coverage of *Younger* to an even broader range of civil cases. In each of the two most recent decisions, the court has reserved the issue of whether *Younger* principles apply to all civil cases. We believe that the facts of the instant case do not require abstention and, moreover, the nature of the constitutional challenge lodged against the questioned statutory scheme presents a compelling reason for this court to serve as the "primary and powerful" source for vindication of federally protected constitutional rights. *Steffel v. Thompson*, 415 U.S. 452, 464, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

█ In *Huffman* the Court emphasized that the fact that the state's criminal process was not involved was not determinative. Rather, a federal court considering an injunction against a pending state proceeding must carefully weigh the notions of comity and federalism and allow the state to effectuate its own policies through "a forum

competent to vindicate any constitutional objections interposed against those policies." *Huffman v. Pursue, Ltd.*, 420 U.S. at 604, 95 S.Ct. at 1208 (1975). The plaintiff in *Huffman* sought an injunction against the execution of a judgment entered in a pending nuisance action brought by the State of Ohio. Because such a federal injunction would disrupt "that State's efforts to protect the very interests which underlie its criminal laws and to obtain compliance with precisely the standards which are embodied in its criminal laws," abstention was required. 420 U.S. at 605, 95 S.Ct. at 1208. The Court, therefore, extended the *Younger* policies of nonintervention to civil cases where the Court could find that a federal injunction would be "an offense to the State's interest . . . every bit as great as it would be were this a criminal proceeding." 420 U.S. at 604, 95 S.Ct. at 1208. It was at this early stage of the evolution of *Younger* to civil cases, that this court issued its preliminary injunction on June 18, 1976.

Since *Huffman*, this court has received the Supreme Court's guidance in *Juidice* and in *Trainor*, both expanding the original narrow application to civil cases in a manner requiring this court to carefully reflect on its judicial responsibilities with respect to the vindication of these plaintiffs' constitutional rights.

In *Juidice v. Vail, supra, Younger* principles were held to prevent a federal court from enjoining a state judicial contempt proceeding on the basis of the weight to be given "a State's interest in the contempt process, through which it vindicates the regular operation of its judicial system." 430 U.S. at 335, 97 S.Ct. at 1217, 51 L.Ed.2d at 384. Acknowledging that such an interest is perhaps "not quite as important as is the State's interest in the enforcement of its criminal laws, . . . or even its interest in the maintenance of a quasi-criminal proceeding such as was involved in *Huffman*," the Court labeled the interest in contempt proceedings as "of sufficiently great import." 430 U.S. at 335, 97 S.Ct. at 1217, 51 L.Ed.2d at 384. In finding that "the contempt power lies at the core of the administration of a State's judicial system," 430 U.S. at 335, 97 S.Ct. at 1217, 51 L.Ed.2d at 384, the Court continued to concern itself with a pending state action which, like a criminal prosecution or nuisance proceeding, was unique to the governmental role of a state.

In *Trainor v. Hernandez, supra,* the Court appears to have expanded the types of state civil proceedings requiring the application of *Younger* principles. In *Trainor* the State of Illinois brought a civil action against the appellees seeking a return of welfare payments alleged to have been wrongfully received and sought a writ of attachment. The three-judge court enjoined the attachment and declared the Illinois Attachment Act to be unconstitutional. In remanding to the lower court for consideration of whether the attachment statute provides a debtor with a proper forum for his constitutional challenge, the Supreme Court noted that the principles of *Younger* and *Huffman* apply to injunctions against actions "brought by the State in its sovereign capacity," 431 U.S. at 444, 97 S.Ct. at 1918, 52 L.Ed.2d at 496, rejecting the argument that attachment was not a remedy unique to the state and emphasizing, instead, that the state was a party to the attachment in its underlying role of administering public assistance programs. The Court concluded that a federal injunction's "disruption of suits by the State in its sovereign capacity, when combined with a negative reflection on the State's ability to adjudicate federal claims" dictated abstention unless "extraordinary circumstances were present." 431 U.S. at 446, 97 S.Ct. at 1919, 52 L.Ed.2d at 497.

▉ It is in this legal and factual setting that this court decides that *Younger* and its progeny do not require application of their principles to the current dispute between these plaintiffs and the State of Texas. Although *Juidice* and *Trainor* have expanded the types of civil cases to which *Younger* extends, it is clear that neither decision purports to apply *Younger* principles to all civil litigation between a state and its citi-

zens. *Juidice*, 430 U.S. at 338, 97 S.Ct. at 1218, 51 L.Ed.2d at 385 n. 13 (1977); *Trainor*, 430 U.S. at 338, 97 S.Ct. at 1918, 52 L.Ed.2d at 496 n. 8 (1977). From this we conclude that because of the wide range of interests and circumstances that could conceivably be present in a civil dispute, the proper role of a federal court is to carefully analyze each dispute individually with an equitable view toward the principles of comity and federalism and a careful study of the state action involved.[4] This court considers the *Younger* principles inapplicable here for two reasons: the nature of the state action and the nature of the plaintiff's challenge.

■ First, the action taken by the State of Texas against the plaintiffs is multifaceted. Unlike a criminal prosecution, or a nuisance, contempt, or attachment proceeding, there is no single state proceeding to which the plaintiffs may look for relief on constitutional or any other grounds. Many of the challenged actions taken by the state do not and will not involve any judicial proceeding.[5] Certainly as to these, there is no pending state civil litigation about which even to consider abstention. The only pending state suit is the one pending in Montgomery County, filed on April 5, 1976. Because the dispute between the plaintiffs and the State of Texas concerns more than a single state judicial action to which plaintiffs could raise a constitutional defense, *Younger* principles are inapplicable. *See Younger*, 401 U.S. at 46, 91 S.Ct. 746 (1971). The entire statutory scheme by which Texas attempts to deal with the problem of child abuse has been challenged and should be viewed as an integrated whole. This court will not consider part of the scheme and abstain from another part. To do so would seriously jeopardize any hope for an effective statutory scheme and, in the name of comity and federalism, do violence to the state functions those principles seek to protect.

■ As a second independent basis for the inapplicability of *Younger* principles, we note that the plaintiffs' constitutional challenge is directed primarily at the legality of the children's seizure and detention for a 42-day period without a hearing. It is clear that because this issue cannot be raised as a defense in the normal course of the pending judicial proceeding, abstention would be inappropriate. *See Gerstein v. Pugh*, 420 U.S. 103, 108 n. 9, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). The denial of custody of the children pending any hearing regardless of the result of the hearing, is in itself sufficient to prevent the application of *Younger*. *Cf. Newton v. Burgin*, 363 F.Supp. 782 (W.D.N.C.1973), *aff'd*, 414 U.S. 1139, 94 S.Ct. 889, 39 L.Ed.2d 96 (1974).

■ Even if the nature of the state action and the constitutional challenge were such as to require the application of *Younger* principles, it is clear that there exists here circumstances where, even though the principles are otherwise applicable, a federal court should not abstain. Certainly, the threatened injury to the plaintiffs is both great and immediate. As we note *infra* the constitutional issues raised by the plaintiffs reach the application of due process in an area of the greatest importance to our society, the family. The constitutional infirmities recognized by this court, if uncorrected, would cause an injury to these plaintiffs far greater than a deprivation of a mere property interest. Furthermore, it has been recognized that where, as here, the plaintiff may not raise all of his constitutional claims as a defense in a *single* state proceeding, the necessary irreparability is present.

4. As an example of the Supreme Court's permitting possible intervention after *Trainor* because of the peculiar nature of the dispute and the interests involved, *see Doe v. Maher*, 414 F.Supp. 1368 (D.Conn.1976), *vacated and remanded on other grounds*, —— U.S. ——, 97 S.Ct. 2474, 53 L.Ed.2d 534 (1977).

5. For example, the plaintiffs complain of the methods by which child-abuse reports are received and recorded and the fact that even an anonymous report of child abuse will label the parents as "child abusers" in a central registry, to become part of a national registration system before any judicial proceeding of even an emergency nature. Title 2, Texas Family Code § 34.06.

*Younger v. Harris*, 401 U.S. at 46, 91 S.Ct. 746 (1971). When reviewing a statute permitting the North Carolina authorities to take custody of children without a hearing under certain circumstances, the court in *Newton v. Burgin, supra*, observed that "the deprivation of custody prior to the civil proceeding is an irreparable injury which is both great and immediate . . . and . . . will not be dissipated in the state proceeding."

■ Of course, we realize that the mere facial invalidity of a statute does not in itself justify federal interference. *Younger v. Harris*, 401 U.S. at 54, 91 S.Ct. 746 (1971); *Huffman v. Pursue, Ltd.*, 420 U.S. at 602, 95 S.Ct. 1200 (1975). While it is clear that intervention is warranted where a statute is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence, and paragraph," *Watson v. Buck*, 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941), such a finding is not the only justification for federal action. In *Younger* the Court explained:

> There may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown in the absence of the usual prerequisites of bad faith and harassment. For example, as long ago as the *Buck* case, supra, we indicated:
>
>> It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it. 313 U.S. at 402 [61 S.Ct. 962].
>
> Other unusual situations calling for federal intervention may also arise, but there is no point in our attempting now to specify what they might be.

401 U.S. at 53–54, 91 S.Ct. at 755.

■ In addition to this court's finding, *infra*, that several sections of the Texas Family Code are "flagrantly and patently"

violative of federal constitutional requirements, the "unusual" circumstances referred to in *Younger* are present here and compel this court to grant equitable relief. Recognizing that more than a "highly unusual factual situation" must be present, *Trainor v. Hernandez*, 431 U.S. at 442, 97 S.Ct. at 1917–1918, 52 L.Ed.2d at 494–95 n.7 (1977), we find the confusion, the procedural irregularities, and the absence of a fair opportunity to present constitutional claims at a meaningful time to be such as to justify federal equitable relief even if *Younger* principles did apply.

■ As a general expression of the extraordinary and compelling circumstances present here, this court finds an absence for these plaintiffs of "an opportunity to fairly pursue their constitutional claims in an ongoing state proceeding." *Juidice*, 430 U.S. at 338, 97 S.Ct. at 1218, 51 L.Ed.2d at 396 (1977) citing *Gibson v. Berryhill*, 411 U.S. 564, 577, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).[6] Unlike the plaintiff in *Juidice*, the *Sims* plaintiffs have not failed to avail themselves of any opportunities in the state procedures. Despite serious constitutional objections to its burden-of-proof requirement, the plaintiffs sought a modification of the original ex parte order pursuant to Section 17.06. Although mandated by the statute, no hearing was afforded them. Plaintiffs also sought to raise their objections in an application for a writ of habeas corpus, but, when they were prepared to seize this opportunity to be heard, the matter was transferred to Montgomery County, and, despite the parents' presence in court earlier that day, the court issued another ex parte custody order and set a hearing in Montgomery County for an uncertain time in the future. Certainly, such efforts to earn an opportunity to be heard are more than sufficient before seeking relief in federal court on April 19, 1976.

The plaintiffs' having sought through diligent efforts an opportunity to be heard in

---

**6.** Some commentators have viewed such a finding as creating an exception of "futility" or "bias" to otherwise applicable *Younger* princi-

ples. *See, Developments—Section 1983*, 90 Harv.L.Rev. 1133, 1324–26 (1977).

a state proceeding, this court must conclude that whatever opportunities exist for them are not such as to allow them to "fairly pursue" their constitutional objections. In reaching such a conclusion, we are mindful that "[t]he policy of equitable restraint . . . is founded on the premise that ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights." *Kugler v. Helfant*, 421 U.S. 117, 124, 95 S.Ct. 1524, 1531, 44 L.Ed.2d 15 (1975), quoted in *Trainor*, 431 U.S. at 434, 97 S.Ct. 1917, 52 L.Ed.2d at 494 (1977). Analogized to a civil dispute, no such premise can be found here. This court has already chronicled the attempts by the plaintiffs to receive any hearing in state court. The plaintiff-parents were separated from their children for a period of 42 days without a hearing—a period ended only·by an order of this court. The burdensome irregularities encountered by these plaintiffs in seeking a state forum for their constitutional claims illustrate to this court that in practice the state procedures operate in such a manner as to prevent or, at the very minimum, substantially delay the presentation of constitutional issues. Under such circumstances, abstention would be inappropriate. *See, Developments—Section 1983*, 90 Harv.L.Rev. 1133, 1325 (1977).

In addition to the apparent procedural futility of requiring the plaintiffs to proceed with the pending suit, the statutory scheme on its face fares no better. The very nature of the constitutional challenge here is to the fairness of the state procedure. Such being the case, especially when

compounded by the irregularities present here, it "plainly appears" that the state forum would not offer these plaintiffs adequate protection in their challenge to the state procedures, even assuming all matters could be raised in a defense to the pending "Suit affecting the parent-child relationship." *Gibson v. Berryhill*, 411 U.S. 564, 569, 93 S.Ct. 1689, 1693, 36 L.Ed.2d 488 (1973).

Therefore, because of the failure of the state to follow its procedures and because of the futile efforts of the plaintiffs to seek relief in the state system,[7] this court finds that there is for these plaintiffs no "opportunity to fairly pursue their constitutional claims in an ongoing state proceeding."

Accordingly, this court holds that abstention is not required because *Younger* principles do not apply to this dispute between the plaintiffs and the State of Texas and, even if such principles do apply, there exist extraordinary circumstances which compel this court to provide a federal forum for the vindication of these plaintiffs' constitutional rights. Having so decided, we must address the merits of the plaintiffs' case.

## II. MERITS

At the outset it must be noted that there is no dispute between the parties as to the gravity of child abuse and the compelling state interest in quickly and effectively removing the victims of child abuse from their parents. Similarly, the parties agree that where real, immediate, and irreparable physical harm is likely the state has an interest in taking so-called "emergency"

---

7. In a recent case, *Ross v. Houston Independent School District*, 559 F.2d 937, 942 (5th Cir. 1977), the court held:

> The abstention doctrines do not embody jurisdictional principles nor are they to be considered as rules of law. Rather, their application is committed to the exercise of a sound discretion based on the facts of each case. *Hill v. City of El Paso, Texas*, 437 F.2d 352 (5th Cir. 1971). The piecemeal results and delays attendant to abstention should not be imposed on the parties to a federal proceeding unless state court action holds realistic promise of avoiding constitutional issues. *Baggett v. Bullitt*, 377 U.S. 360, 84

S.Ct. 1316, 12 L.Ed.2d 377 (1964). Any consideration of abstention, whether under *Pullman* [*Railroad Commission of Texas v. Pullman Company*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971] or other doctrines ["(2) to avoid needless conflict with the administration by a state of its own affairs; (3) to leave to the states the resolution of unsettled questions of state law; and (4) to ease the congestion of the federal court docket," C. A. Wright, Law of Federal Courts, 3d ed. 218], must take into primary account its effects on the rights sought to be protected in the court asked to stay its hand.

possession of the children. The gravamen of the plaintiffs' complaint is that in effectuating the legitimate state interest, the Texas Family Code does so in a manner which contravenes basic constitutional principles. They have mounted a broad-based challenge to Chapters 11, 14, 15, 17, and 34 of Title 2, Texas Family Code.

 This court has, upon the advice of both parties, carefully viewed the challenged provisions as being interdependent. Briefly, the procedure under surveillance here begins with Chapter 34, which is concerned with the reporting of suspected child abuse and the initial investigative steps by the State Department of Public Welfare. Once suspected abuse is identified under Chapter 34, Chapter 17 enables the State to take possession of the victims for the "Protection of [a] Child in [an] Emergency."[8] By the terms of Section 17.05(b)(2), the State may then institute a "Suit affecting the parent-child relationship." This term of art is defined in Section 11.01(5) as

> "a suit . . . in which the appointment of a managing conservator or a possessory conservator, access to or support of a child, or establishment or termination of the parent-child relationship is sought."

Such a suit, therefore, refers both to a Chapter 14 proceeding, in which the appointment of a conservator is sought, and to a Chapter 15 proceeding, which is entitled "Termination of the parent-child relationship."

In the suit filed by these defendants at the direction of Judge Lowry, pending in Montgomery County, only Chapter 14 relief was being sought at the time the court issued the preliminary injunction. Consequently, the defendants have questioned the standing of the Sims parents to challenge the constitutionality of any part of Chapter 15. This court finds, however, that the spectre of a Chapter 15 suit involving the Sims family is sufficient to confer standing. See O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974);

Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). The caseworker assigned to investigate the Sims family, Rex Downing, testified in his deposition that he would seek permanent termination of the parent-child relationship as part of the Montgomery County action, which is entitled broadly "Suit affecting the parent-child relationship."

 It is now clear that there is a fundamental right emanating from the Constitution, which protects the integrity of the family unit from unwarranted intrusions by the state. The Supreme Court in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) commented:

> The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," "basic civil rights of man," and "rights far more precious than property rights." It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment. [Citations omitted.]

405 U.S. at 651, 92 S.Ct. at 1213. See also Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1943); May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); Griswold v. Connecticut, 381 U.S. 749, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Cleveland Board of Education v. La Fleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); Alsager v. District Court of Polk County, Iowa, 406 F.Supp. 10 (S.D.Iowa 1975); Roe v. Conn, 417 F.Supp. 769 (M.D.Ala.1976). Having emphasized the importance of such a right, courts are required to carefully

---

8. See Title 2, Texas Family Code §§ 34.05(d), infra at n. 9, which allows the institution of a Chapter 17 proceeding during or as a result of a Chapter 34 investigation.

scrutinize any attempt by a state to intrude upon it. It is axiomatic that where due process must be afforded, the courts must still decide what process is due. *Morrisey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In making such an analysis the competing interests must be identified and weighed. There are three: the liberty and privacy interest afforded to the parents, the interest of the state, as *parens patriae*, in protecting children from harm, and finally, the often silent interest of the child.

■ *Reporting Child Abuse.* Chapter 34 of Title 2, Texas Family Code is directed at the preliminary investigative powers of the state before any judicial relief is sought. Although recognizing the need to encourage the reporting and investigation of suspected cases of child abuse or neglect, we find that three aspects of Chapter 34 violate minimal constitutional guarantees. First, to the extent that a court order under § 34.05(c) [9] may be obtained without notice to the parents and upon any showing less than that the relief sought is necessary to aid in the determination of the existence of any abuse, it violates due process by permitting an unbridled invasion of the family unit. There is little doubt that the mandate of due process extends to an investigative stage of state action. Psychological or psychiatric examinations represent such an intrusion into the privacy of the family that, if objected to, should not be ordered without some type of adversary hearing before a judicial body. The state's interest in the protection of the child is not endangered by the requirement of such notice because of the existence, under unusual cir-

cumstances, of the course of action available under § 34.05(d).[10]

■ A second constitutional defect in the system of reporting child abuse appears in Section 34.08, which provides:

The reports, records, and working papers used or developed in an investigation made under this chapter are confidential and may be disclosed only for purposes consistent with the purposes of this code under regulations adopted by the investigating agency.

Despite assurances from the state that the investigation permitted by Chapter 34 is "nonaccusatory," it is undisputed that the information gathered pursuant to that chapter is used as a basis for further action by the state under Chapter 17, 14, or 15.

■ Although some intrusion into a family unit is permissible when the state pursues its interest in investigating reports of abuse, there is no compelling reason to deny the family access to the fruits of that invasion or the conclusions reached. Of course, a certain confidentiality must be maintained for sources of information who request such anonymity, but the reports [11] and records of the state compiled during the investigation should be available to the parents so that they may be fully apprised of the nature of any accusation to be made by the state. Due process requires no less. A state may deny the parents access to the records concerning their family only where the source must remain confidential or where there has been a judicial determination of the need for confidentiality in an adversary proceeding.

---

9. (c) The investigation shall include a visit to the child's home, a physical and psychological or psychiatric examination of all the children in that home, and an interview with the subject child. If admission to the home, school, or any place where the child may be, or permission of the parents or persons responsible for the child's care for the physical and psychological or psychiatric examinations cannot be obtained, then the juvenile court, or the district court, upon cause shown, shall order the parents or the persons responsible for the care of the children, or the person in charge of any place where the child may be, to allow entrance for

the interview, above examinations, and investigation.

(d) If, before the investigation is complete, the opinion of the investigators is that immediate removal is necessary to protect the child from further abuse or neglect, the investigators shall file a petition pursuant to Chapter 17 of this code for temporary care and protection of the child.

10. *Id.*

11. Section 34.05(e) requires the appropriate agency to make a complete written report of their investigation.

Finally, with regard to Chapter 34, this court finds that Section 34.06 [12] represents an unconstitutional infringement on the right to privacy and the guarantees of due process. In implementing that section, the State Department of Public Welfare has devised the Child Abuse and Neglect Report and Inquiry System (CANRIS). CANRIS is a computerized system designed to collect and store the confidential information gathered by the state from the inception of an investigation through final disposition. It is clear from the expressed purpose of CANRIS that it goes far beyond the permissible maintenance of investigatory files. The mere filing of a report of child abuse is cause enough for the system to operate. The record in this case indicates that CANRIS places labels of "perpetrator" on those parents who are ensnarled into its web—a conclusion reached by the state without any judicial determination. Similarly, CANRIS may label the report as "validated," which by the terms of its operation manual is appropriate where "the investigating worker has proved that neglect or abuse exists." This use of information gathering and dissemination absent a judicial determination of abuse or neglect is an impermissible violation of due process and right to privacy. Of course, the state may maintain investigative files. However, to the extent that CANRIS purports in any way to be a clearinghouse of child-abuse information without a judicial determination thereof, it is an unconstitutional infringement on the rights of the parents.

The injury to these plaintiffs is far greater than the public damage to the plaintiff's reputation in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In that case, the Supreme Court held that an interest in one's reputation alone was not a "liberty" or "property" interest requiring due process before it could be altered by the State. The Court carefully distinguished "matters relating to marriage, procreation, contraception, family relationship, and child rearing and education" as being "far afield" from that plaintiff's claim. 424 U.S. at 713, 96 S.Ct. 1155. Therefore, we find that the current use of a central registry for child-abuse reports is unconstitutional.

*Summary Seizure.* Although the State of Texas has an interest in protecting children from abuse as quickly as possible, that interest is not sufficient to justify removal of the child without notice and an adversary hearing unless there exists an immediate threat to the safety of the child. Chapter 17 is the attempt by the Texas Legislature to deal with such an emergency.[13] An emergency, however, does not permit the State to disregard all notions of due process. In that regard, we find the procedures of Chapter 17 to be patently and flagrantly violative of basic constitutional guarantees.

Section 17.01 allows the State Department of Public Welfare to take custody of a child in order "to protect him from an immediate danger to his health or physical safety." Such language represents a constitutionally adequate standard.[14] After seizure, however, the "hearing" required by Section 17.02 is, in reality, no more than an ex parte presentation of a petition to a court without actual delivery of the children to the court. Although an ex parte order under these circumstances is, in itself, not constitutionally infirm, and the "hearing" may, pursuant to Section 17.03, proceed "without notice," the due process in-

---

**12.** *Section 34.06. Central Registry.*

The State Department of Public Welfare shall establish and maintain, in Austin, Texas, a central registry of reported cases of child abuse or neglect. The department may adopt rules and regulations as are necessary in carrying out the provisions of this section. The rules shall provide for cooperation with local child service agencies, including hospitals, clinics, and schools, and cooperation with other states in exchanging reports to effect a national registration system.

**13.** The relevant portions of Chapter 17 are set out in note 1, *supra*.

**14.** The standard of Section 17.01 is far more acceptable than the one found to be unconstitutional by the court in *Roe v. Conn*, 417 F.Supp. 769 (M.D.Ala.1976). In that case, Alabama Code, Title 13, § 352(4) provided for emergency custody of the child when "its welfare requires."

terest of the parents is such as to require the State to make all reasonable efforts to serve upon them notice of this initial presentation to the court.

■ Section 17.02 currently requires that the appropriate petition be filed "immediately on delivery of the child to the court" and requires that the ex parte "hearing" be held "to provide for the temporary care or protection of the child." Two constitutional defects exhibit themselves. First, there is no requirement that the hearing itself be held "immediately." Barring unusual circumstances, the State's interest in the protection of the alleged victims of abuse and the resulting usurpation of parental rights does not justify holding this ex parte presentation to a judicial authority beyond the very day of seizure. Secondly, through what this court assumes to be legislative oversight, the hearing is "to provide for the temporary care or protection of the child"—language which assumes that such care or protection is needed.

■ It is Sections 17.05 and 17.06 that are fraught with constitutional defects. After the State takes emergency custody of the child and there has been a preliminary ex parte judicial determination of the propriety of the State's act, a full adversary hearing with notice should be held at the expiration of the ex parte order. Section 17.05 currently requires no such hearing at the expiration of the initial order and, instead, places a clearly unconstitutional burden on the parents, via Section 17.06, to seek a modification of the order. In the event the children remain in the custody of the State pursuant to the temporary order, due process requires that in all cases a full hearing be held or that the children be returned to the custody of their parents. The fact that the parents may have been present at the initial temporary "hearing" does not relieve the State of the obligation to conduct the full adversary hearing with adequate notice to the parents. Such notice, of course, includes an adequate statement in the petition of the factual allegations upon which the State is relying to support Chapter 17 relief. Furthermore, to the extent that Section 17.05(b)(2) permits a court to "direct the filing of a suit affecting the parent-child relationship" without having first determined the need therefor in a full adversary hearing, it is an unconstitutional deprivation of due process.

■ The question remains as to how long the children, under these emergency situations, may be separated from their parents without a hearing. We regard Section 17.05's suggestion of a ten-day period to be constitutionally acceptable although, in the view of this court, the five-day period upheld in *Newton v. Burgin*, 363 F.Supp. 782 (W.D.N.C.1973), would offer a better solution. The ten-day period, however, may not run from the "date of the [initial] order." Other summary deprivations of a property or liability interest have been upheld for a period measured from the date of the deprivation. *See, e. g., Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The record in the instant case reflects that the date of the seizure and the date of the initial orders may not be the same. Therefore, what this court perceives to be the constitutional limit of ten days must run from the date on which the State removed the children from the custody of their parents.

In particular, the State may not obtain a ten-day ex parte order under Chapter 17 and then, through the vehicle of Section 17.05(b)(2), institute a suit affecting the parent-child relationship and obtain another ten-day ex parte order under Section 11.11(a)(4). This "stacking" of ex parte orders may result, under current statutory provisions, in a minimum of a twenty-day period during which the parents may be deprived of the custody of their children without an adversary hearing before an impartial tribunal. This court reiterates that under no circumstances, either under Chapter 17 or under Section 11.11(a)(4), may the State retain custody of the child for more than ten days without a complete adversary hearing with notice to the parents.

■ At the required hearing, the State must make a clear showing that continued

custody is necessary to protect the child from physical danger. Even a temporary order under Section 11.11 may be based on no less a showing. Should the State be entitled to continued custody, the nature of the interests here require that a suit affecting the parent-child relationship should commence immediately so that the swiftest resolution of the merits may be obtained.

■ *Standard of Proof.* Section 11.15 provides for a preponderance of the evidence standard in any suit affecting the parent-child relationship. While such a suit is not akin to a delinquency proceeding requiring proof beyond a reasonable doubt, *In Re Winship*, 397 U.S. 358, 90 S.Ct. 358, 25 L.Ed.2d 368 (1970), the fundamental right to family integrity requires at the very least that the State notify the parents of the allegations and prove its case by clear and convincing evidence. *Alsager v. District Court of Polk County, Iowa, supra.*[15]

■ *Appointment of Counsel.* Section 11.10 provides, in pertinent part:

(a) In any suit in which termination of the parent-child relationship is sought, the court shall appoint a guardian ad litem to represent the interests of the child, unless the child is a petitioner or unless an attorney ad litem has been appointed for the child or unless the court finds that the interests of the child will be represented adequately by a party to the suit and are not adverse to that party.

. . . . .

(c) The court may appoint an attorney for any party in a case in which it deems representation necessary to protect the interests of the child who is the subject matter of the suit.

The plaintiffs have argued that this provision violates the due process clause of the constitution by not requiring the appointment of an attorney for the child. This court agrees. Certainly, "the right to be

heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932). In a suit for the involuntary termination of parental rights, the child's interest is generally distinct from that of either the State or the parents. In *In Re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527, (1967), the Supreme Court recognized the separate interest of a child in a juvenile delinquency proceeding as one deserving of constitutional protection.[16] The mere fact that a proceeding under the Texas Family Code is labeled "civil" and a delinquency proceeding as "criminal" simplistically ignores an analysis of the real interests involved and the rights of all parties to a fair hearing. *See McKeiver v. Pennsylvania*, 403 U.S. 528, 541, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). Therefore, in any proceeding in which the termination of the parent-child relationship is sought, the court is required to appoint counsel to represent the interests of the child and require the parents to pay for that representation, if they are able to do so. *Roe v. Conn*, 417 F.Supp. 769, 780 (M.D.Ala.1976). If, as the statute suggests, another party would adequately represent the interests of the child, an appointment of counsel for the child would be unnecessary as long as such representation was through an attorney. Section 11.10 allows another party to represent the child only if there are no adverse interests. While this condition is constitutionally sufficient on its face, it has been applied unconstitutionally to the extent that the state itself has been appointed as the other party to represent the child. We have repeatedly herein emphasized the separate competing interests necessarily involved in any suit affecting the parent-child relationship. The interest of the state and the interest of the child differ in such a manner that they must be assumed to be adverse until there has been a final adjudication on the merits.

**15.** *See also* National Council on Crime and Delinquency, Model Rules for Juvenile Courts, Rule 26 (1969); *Singleman*, A Case of Neglect: Parens Patriae Versus Due Process in Child Neglect Proceedings, 17 Ariz.L.Rev. 1055, 1087 (1975).

**16.** *Cf. Hegwood v. Kindrick*, 264 F.Supp. 720 (S.D.Tex.1967).

■ Because of the requirement of an attorney for the child at these proceedings, it follows that it must include representation at an "emergency" proceeding under Chapter 17, the result of which may be the institution of a suit for the termination of the parent-child relationship.

With regard to the appointment of counsel for the parents at any proceeding for the termination of parental rights, it is agreed that the plaintiffs in the *Sims* case, not being indigent, do not raise the issue. The *Woods* case was consolidated with the *Sims* case solely on the right of indigent parents to counsel. This court has carefully studied the arguments of counsel and we concur with the defendants that the named plaintiffs in the *Woods* case lack standing to raise that issue. The record is clear that both plaintiffs Woods and Troncosa were represented in the termination proceedings by counsel provided by the Houston Legal Foundation, a legal services corporation.

The *Woods* case is a class action pending before another judge of this court. In light of recent decisions of this Circuit, it appears that our limited consolidation of the *Woods* case before class certification was ill-advised. *See McArthur v. Southern Airways, Inc.,* 556 F.2d 298 (5th Cir. 1977); *Satterwhite v. City of Greenville,* 549 F.2d 347 (5th Cir. 1977). Because there has been no decision as to the maintainability of a class in that case, we only consider the standing of the two named plaintiffs and direct that the issue of the right to counsel for parents in the putative class remain pending with the *Woods* case.

Therefore, for the reasons stated herein, the court finds that the following provisions of Title 2, Texas Family Code—Sections 11.10, 11.15, 17.02, 17.03, 17.05, 17.06, 34.-05(c), and 34.08—are unconstitutional on their face; and the defendants are permanently enjoined from applying and enforcing these provisions. Furthermore, the court finds that the use of CANRIS as provided for in Section 34.06 for information gathering and dissemination of child abuse reports absent a judicial determination of abuse or neglect and the use of Section 11.11(a)(4) in conjunction with Chapter 17 to deprive parents of custody of their children for longer than ten days without an adversary hearing are unconstitutional applications of these provisions; and the defendants are permanently enjoined from so applying or enforcing them.

■ Finally, the plaintiffs have sought monetary relief in the nature of actual damages and punitive damages for what the First Amended Complaint describes as a "reckless, wilful and wanton disregard" of their rights. Upon careful consideration of the facts of this case, the nature of the constitutional challenge, and the decision of this court, we find no evidence to support the award of any monetary damages.