**Carolyn HEARN, et al.,
Plaintiffs-Appellees,**

v.

**Mose PLEASURE, Individually and in his capacity as Commissioner of the State of Tennessee Department of Human Services, Defendant-Appellant.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

July 29, 1981.

Rehearing Denied Sept. 25, 1981.

Appeal Denied by Supreme Court
Nov. 30, 1981.

David A. Ettinger, Legal Services of Middle Tennessee, Gallatin, and Linda L. Moore, West Tennessee Legal Services, Jackson, for plaintiffs-appellees.

William B. Hubbard, Chief Deputy Atty. Gen., Nashville, for defendant-appellant; William M. Leech, Jr., Atty. Gen., Nashville, of counsel.

## OPINION

CANTRELL, Judge.

This action presents the question of the right to pretrial discovery of evidence in the files of the Department of Human Services where the Department has filed a petition in Juvenile Court to terminate parental rights or to remove a child from the custody of its natural parents.

On June 19, 1979, the Department of Human Services filed a petition against Carolyn Hearn in Wilson County Juvenile Court alleging that her child was a dependent and neglected child and should be removed from her custody. The child was taken and placed in the custody of the

Department of Human Services pursuant to an emergency ex parte order.

On July 2nd, 1979, the Department of Human Services filed a second petition against Carolyn Hearn in Wilson County Juvenile Court, alleging that two of her other children were dependent and neglected children and should be made wards of the court. The Juvenile Court set a hearing on this petition for September 25th, 1979.

On June 20th, 1979, the Department of Human Services filed a petition against Nancy Jane Collins seeking to terminate her parental rights to her child, Candy Lynn Collins. A hearing was scheduled in Juvenile Court for October 9th, 1979.

Carolyn Hearn, through her attorney, requested on July 10th, 1979 that she be allowed to inspect the Department of Human Services files relative to the petitions brought against her. A similar request was made on behalf of Nancy Jane Collins. The plaintiffs were informed that they would not be allowed to inspect the requested documents and that it was the policy of the Department of Human Services to refuse to voluntarily allow such inspection by parties to petitions seeking to limit parental rights.

On August 20th, 1979, plaintiffs filed motions in the Juvenile Court for Wilson County, Tennessee, asking that the Department of Human Services be ordered to produce for inspection and copying material in its files relevant to the petitions filed against them. These motions were denied. On September 14th, 1979, the plaintiffs filed this action in the Chancery Court of Davidson County, naming the Commissioner of the Department of Human Services as a defendant, alleging that the Department of Human Services had in its files certain documents relevant to the petitions pending against the plaintiffs, and seeking to be allowed to inspect and copy the requested documents. The complaint further sought a declaration that the policy and practice of the defendant in denying access by plaintiffs to the documents described in the complaint was unlawful.

Both sides made motions for summary judgment and the Chancellor entered an order declaring the policy of the defendant to deny opposing counsel or parents access to the relevant Departmental records prior to a court hearing unconstitutional under the provisions of the Tennessee Constitution and the Constitution of the United States. The Chancellor's order permanently enjoined the defendant to make relevant and non-privileged records available to parents reasonably in advance of hearings to terminate parental rights or dependency and neglect hearings.

The Commissioner has appealed.

■ The first issue raised by the appellant challenges the jurisdiction of the Chancery Court to determine the right to discovery in Juvenile Court. The authorities cited by the appellant deal with the exclusive jurisdiction of juvenile courts over the proceedings involving liberty, well-being, rights and obligations of juveniles. We are of the opinion that the appellant is confusing the jurisdiction of the Chancery Court to render declaratory judgments, injunctions, and to entertain a bill of discovery with the jurisdiction over juveniles themselves. A bill of discovery, although now rendered nearly obsolete by modern discovery rules, is one of the remedies adopted by the early Chancellors to prevent unscrupulous litigants from taking advantage of the common law rule which prevented the parties from testifying in their own behalf. This interesting phenomenon of the early common law and the reaction of the Court of Chancery to it is discussed in Gibson's Suits in Chancery § 1184 (5th ed. 1956).

Since a bill of discovery falls within the ancient and inherent jurisdiction of the Chancery Court and it is not disputed that the Chancery Court has the jurisdiction to grant injunctive relief and to render declaratory judgments, we conclude that the Chancellor had jurisdiction over the action filed by the appellees.

We believe the remaining issues raised by the appellant can be summarized as follows: Does the denial of pretrial discovery in Juvenile Court conflict with the Due Process provisions of the Constitution of the United States or of the State of Tennessee?

■ At the outset we should stress three things. First, what plaintiffs are seeking is *pre-trial* discovery of evidence in the files of the Department of Human Services. T.C.A. § 37–218 makes clear that any party may subpoena witnesses and compel production of papers *at the hearing itself.* Second, a party has the absolute right to appeal and a trial *de novo* in the Circuit Court. T.C.A. § 37–258. Third, the concept of due process is closely related to the concept of "fairness." "A basic requirement of due process is a fair trial in a fair tribunal." *State ex rel Anglin v. Mitchell,* 596 S.W.2d 779 (Tenn.1980).

From the perspective of history, we would have to say that the Due Process provisions of our Constitution did not cover the right to pre-trial discovery. Discovery was unknown to the early common law. Before the plight of litigants touched the King's conscience and the Chancellors came to their aid and granted some limited relief under the bill of discovery, a trial at common law was a sporting event where the parties were expected to act like gentlemen but where the rules of the game did not require an adversary to tip his hand. This influence on the development of the common law is discussed in Wigmore on Evidence, Vol. VI, § 1845 (1976).

(a) In the first place, the common law originating in a community of sports and games, was permeated essentially by the *instincts of sportsmanship.* This has had both its higher and lower aspects. On one hand, it has contributed a sense of fairness, of chivalrous behavior to a worthy adversary, of carrying out a contest an equal and honorable terms. The presumption of innocence, the character rule, the privilege against self-crimination and other specific rules (to name those of evidence alone) show the effect of this instinct against taking undue advantage of an adversary. The minor rules of professional etiquette (surviving more markedly in England than in the United States) illustrate the same tendency even more clearly. On the other hand, it has contributed to lower the system of administering justice, and in particular of ascertaining truth in litigation, to the level of a mere game of skill or chance. Some of the effects of this unfortunate tendency have been noted in other places (§§ 57, 194 *supra* ; § 2251 *infra* ). It may be seen also in the rule allowing a new trial for an immaterial error in a ruling upon evidence (§ 21 *supra* ), and in the general attitude towards rules of procedure as expedients for winning the game of litigation irrespective of the ascertainment of truth. The right to use a rule of procedure or evidence precisely as one plays a trump card or draws to three aces or holds back a good horse till the home stretch, is a distinctive result of the common law moral attitude toward parties in litigation.

\* \* \* \* \* \*

Now one of the cardinal moral assumptions in a contest of skill or chance is that a player need not betray beforehand his strength of resource, and that the opponent cannot complain of being surprised. The accepted laws and moral standards of bridge protect the player from exposing his cards before playing them; the owner of the racing stable keeps as a valuable secret the time made by his horse in the last private trial before the race; and a chessplayer's skill consists largely in concealing from the opponent the farseeing sequence of moves which he has planned.

It is this feature of games and sports that has influenced powerfully the policy of the common law in the present aspect. "Nemo tentur armare adversarium suum contra se." To require the disclosure to an adversary of the evidence that is to be produced would be repugnant to all sportsmanlike instincts. Thus the common law permitted a litigant to reserve his evidential resources (tactics, documents, witnesses) until the final moment, marshalling them at the trial before his surprised and dismayed antagonist.

Such was the spirit of the common law; and such in part it still is. It did not defend or condone trickery and deception; but it did regard the concealment of one's

evidential resources and the preservation of the opponent's defenseless ignorance as a fair and irreproachable accompaniment of the game of litigation. There is no accounting for this except as a product of a characteristic instinct of the Anglo-Norman community in which our law took shape.

Coupled with the sporting instinct was the belief that the elaborate rules of pleading in common law courts could reduce a case to one controverted fact which could be submitted to the jury.

Written pleadings formed the traditional basis of preparation for trial in courts of common law. The chief objective of common law pleading was the production of a single issue which might be tried by the jury. The facts of the controversy were supposed to be narrowed down to a single issue from the respective allegations of the parties. The plaintiff was required to plead his case according to its legal effect and, therefore, could not plead evidence but only the ultimate facts upon which his claim rested. [Stephen on Pleading, 341] When the facts had thus been stated by the pleader, the opposite party was required to deny specifically each allegation which he wished to controvert at the trial. All the well-pleaded facts not denied by the adverse party were deemed to be admitted. This device, applied to the alternate pleadings, was supposed in the end to produce a single controverted point or issue, but a great number of highly technical rules were required to make it effective. As has been said, "refinements of pleadings grew up on the court's passive willingness to let issues emerge out of the allegations recited to it by contending pleaders in antiphonal rivalry, and the stilted form which written pleadings eventually assumed was born of the tradition of care with which every statement in one's opponent's pleading had to be met to the court's satisfaction without disclosing to that opponent too much of one's own case." Ragland, Discovery Before Trial (1932).

As already indicated, the emergence of Chancery as a separate court with its own procedure was a product of a more realistic attitude. The Chancellors recognized that all litigants were not persons of good conscience, guided by honor and motivated to give a worthy adversary a fair chance, and that the elaborate rules of common law pleading produced more of a ritual and ultimately served only to reveal the pleader's skill at obfuscation. The pleadings became more inadequate as a basis of preparation for trial with the emergence of the general issue plea, a device used to deny everything in the opposite pleading. Having the effect of a general denial, the general issue plea, however, allowed a defendant to present a wide range of defenses at the trial while concealing his true position. *See* Caruthers, History of a Lawsuit, 8th Ed. §§ 206–227. Thus a bill of discovery in Chancery became an important means of discovering facts prior to trial.

The remedy, however, had an unusual limitation. It only allowed discovery of facts which helped to prove the case of the party filing the bill; it did not allow discovery of facts which established the claim or defense of the other party. *N. C. & St. L. Ry. Co. v. T. S. Jenkins & Sons*, 155 Tenn. 605, 296 S.W. 1 (1927). Consider the following passage from *Combe v. London*, 4 Y. & C. 139, 155 (1840):

A party has a right to file a bill of discovery for the purpose of obtaining such facts as may tend to prove *his* case; and if those facts are either in possession of the other party, or, if they consist of documents in possession of the other party, in which he either has an interest, or which tend to prove his case, and have no relation to the case of the other party, he has a right to have them produced, and he may file a bill of discovery, in order to aid him in law or in equity, to exhibit those documents in evidence, or compel a statement of those facts. But does it not rest there? Has he a right, as against the defendant, to discover the *defendant's* case? Does any case go to the length of that? Sometimes the cases trench very much on those limits; but if you take the

question as a matter of principle, has a man a right, or is it consistent with common justice, that he should file a bill to discover the defendant's case? The ground on which he files his bill, is to make the defendant discover what is material to his (the plaintiff's) case; but he has no right to say to the defendant, "Tell me what *your* title is—tell me what your case is—tell me how you mean to prove it—tell me the evidence you have to support it—disclose the documents you mean to make use of in support of it—tell me all these things, that I may find a flaw in your title." Surely that is not the principle of a bill of discovery. And if you look at the cases, you will find, however they may occasionally trench on the line of distinction—you will find that is the great line of distinction.

This restriction applied also, as logically you would assume, to documents in the possession of the opposing party:

In short there was in chancery no exception to the broad principle of the common law that a *party is not entitled to ascertain before the trial* the tenor of the documentary evidence which the *adversary possesses to support his own case.*

However difficult and inconsistent this principle might be in its detailed application, it is essential to note its unquestioned acceptance as a principle; because the advances which have been made in a more enlightened direction will thus be seen to be a distinct derogation from the established doctrine of chancery and to be wholly the creature of statute or rule of court. Wigmore on Evidence, § 1857, p. 567.

It is important to note that Wigmore does not say that the constitution requires discovery in the interest of fairness.

■ By statute in Tennessee in 1848 discovery became available in an action at law where the party would, by the rules of equity, be entitled to discovery in aid of the action at law. *See* T.C.A. § 24–1101 et seq., in superseded Vol. 5 of the Code. By the sweeping changes in procedure in the middle part of this Century which are embodied in our Rules of Civil Procedure, discovery is now available to find out anything "relevant and not privileged" to the case under consideration and documents will be produced for inspection and copying. *See* Tennessee Rules of Civil Procedure, Rules 26–37. These rules, however, do not apply in the Juvenile Court. *Patrick v. Dickson*, 526 S.W.2d 449 (Tenn.1975).

We conclude, therefore, that pre-trial discovery was not a part of the common law concept of fairness.

■ We must still, however, consider the question in the light of the present situation or the "advancing standard" of due process which has been recognized in recent decisions by our Supreme Court. "That which we accepted without question in an earlier era, today we reject in view of evolving standards of fairness." *State ex rel Anglin v. Mitchell*, 596 S.W.2d 779 (Tenn.1980).

In *Anglin*, the Court decided that requiring a juvenile to stand trial in Juvenile Court before a non-lawyer judge in a case which might result in incarceration violated the Due Process requirements of our Constitution. This, despite the absolute right to an appeal and a *de novo* trial in the Circuit Court. The Court took great pains to distinguish the case of *North v. Russell*, 427 U.S. 328, 96 S.Ct. 2709, 49 L.Ed.2d 534 (1976), in which the United States Supreme Court said that since on appeal a *de novo* trial before a lawyer was available, the trial of an adult accused of a misdemeanor before a non-lawyer judge did not offend due process. It should be kept in mind that the *Anglin* decision involved the physical liberty of the juvenile; the Court was careful to point out that the decision did not cover cases involving the control or physical care of a child with the goal of providing for the physical, mental, moral and emotional well-being of the child. *See State ex rel Anglin v. Mitchell, supra*, at 795.

Therefore we conclude that the requirements of due process are not as compelling in cases such as the one under consideration as in a case involving the possibility of confinement of the juvenile in a correctional setting.

There have been cases in other jurisdictions which have held that the denial of access to the files of the State Department prosecuting a termination petition violated the parents' right to due process. *Sims v. State Dept. of Public Welfare*, 438 F.Supp. 1179 (S.D.Tex.1977); *In Re S–M–W*, 485 S.W.2d 158 (Mo.App.1972); *In Re Chandler*, 370 P.2d 626 (Ore.1962). However, neither case addressed the question of the possibility of appeal and a *de novo* trial after the opening of the files in the Juvenile Court.

It seems to us that if the appellee is correct in its contention, then any criminal defendant would be entitled to discovery as a matter of due process as well. Certainly, the Courts have recognized that a high standard of fair play must be applied to criminal proceedings entitling the criminal defendant to notice of the charges against him and a fair hearing on those charges. But the Courts have not held that a criminal accused is entitled to discovery of the State's proof prior to trial as a matter of constitutional right. The allowance of pre-trial discovery in criminal cases has resulted from Court rules or the action of the Legislature. *See* Tennessee Rules of Criminal Procedure, Rule 16.

Analogous to the case under consideration is a criminal prosecution in the General Sessions Court. No one would contend that there is any less fairness required in a criminal prosecution in General Sessions than in a termination proceeding in the Juvenile Court. And yet the Supreme Court has held that the discovery provisions of Rule 16 of the Rules of Criminal Procedure do not apply to the General Sessions Court. *State v. Willoughby*, 594 S.W.2d 388 (Tenn. 1980). Prior to the adoption of the Criminal Rules the Supreme Court held that a criminal defendant was not entitled to discovery as a general proposition. *Bosley v. State*, 218 Tenn. 134, 401 S.W.2d 770 (1966).

This Court has held that a defendant has very broad rights to subpoena and examine the State's witnesses in a hearing before the Juvenile Court. *State v. Womack*, 591 S.W.2d 437 (Tenn.App.1979). Although that case involved a criminal proceeding, it would appear that the same rule would apply in a civil case such as the one under consideration. Also see T.C.A. § 37–218. We believe that this right coupled with the absolute right to appeal and a trial *de novo* in Circuit Court insures a fair trial to the plaintiffs.

We hold therefore that the Due Process provisions of the Constitution of the United States or of the State of Tennessee do not require pre-trial discovery in a case such as this pending in the Juvenile Court. The decision of the lower Court is reversed and the cause dismissed. Costs are taxed to the appellees.

REVERSED AND DISMISSED.

TODD, P. J., and CONNER, J., concur.

OPINION ON PETITION TO REHEAR

CANTRELL, Judge.

 The plaintiffs-appellees have filed a petition to rehear on the ground that Public Chapter No. 355 of the 1981 General Assembly renders the constitutional issues in this cause moot and that the Court's decision is contrary to that statute. This statute provides:

> Notwithstanding any other provisions of the law to the contrary, the Department of Human Services shall grant access to all public assistance records, reports, documents, case files, or other similar documents about a person who has applied for or is receiving or has received public assistance including but not limited to AFDC, Food Stamps, Medicaid, and Title XX services, to authorized counsel for the person.

The reference in the statute to Title XX is to Title XX of the Social Security Act, 42 U.S.C. §§ 1397–1397f, which provides for federal payment of 75% of a state's expenditures for services provided for the purposes of preventing or remedying neglect or

abuse of children and preserving or reuniting families.

We are of the opinion that whether the statute covers persons in the position of plaintiffs-appellees is questionable. Their children who have been placed in foster homes may be receiving Title XX services but it is doubtful that the plaintiffs-appellees are. Since that question has not been briefed nor argued we will not decide it. We are satisfied that the passage of the statute does not render the constitutional issues in this case moot.

Therefore the petition to rehear is respectfully denied.

TODD, P. J., and CONNER, J., concur.